**CITIZENS NATIONAL BANK and Lender Asset Recovery, Inc., and Don Lawson, Appellants,**

v.

**ALLEN RAE INVESTMENTS, INC., Ruth Narramore, Ruth Ann Taylor, and Erika Taylor, Appellees.**

No. 2–02–095–CV.

Court of Appeals of Texas, Fort Worth.

July 15, 2004.

Dee J. Kelly, Jr., Brian S. Stagner, Todd W. Spake, Kelly, Hart & Hallman, P.C., Mr. Bryan D. Burner, Bruner, Jamieson & Pappas, L.L.P., W. Alan Wright, Karen S. Precella, Benjamin L. Mesches, Haynes and Boone, L.L.P., Bruce W. McGee, Gandy, McGee & Hall, P.C., Fort Worth, for Appellants.

J. Kevin Clark, Kirkley, Schmidt & Cotten, L.L.P., Joseph W. Spence, J. Christopher Nickelson, Shannon, Gracey, Ratliff & Miller, L.L.P., Fort Worth, Michael. A. Simpson, Derrick S. Boyd, Simpson & Boyd, Decatur, for Appellees.

Panel A: CAYCE, C.J.; and DAUPHINOT, J.

**OPINION ON REHEARING**

LEE ANN DAUPHINOT, Justice.

After reviewing Appellant Don Lawson's motion for rehearing, Appellees' motion for rehearing, and Appellants Citizens National Bank's and Lender Asset Recovery's response to the motions for rehearing, we deny the motions. We withdraw our March 11, 2004 opinion and judgment and substitute the following.

This appeal is from a lawsuit involving a loan Citizens National Bank (CNB) made to Allen Rae Investments, Inc. (ARI) and upon which ARI defaulted. Appellants CNB, Lender Asset Recovery, Inc. (LAR), and Don Lawson appeal from a judgment awarding approximately $1.2 million to Appellees ARI and its principals, Ruth Narramore, Ruth Ann Taylor, and Erika Taylor. We affirm the judgment against LAR. Regarding CNB and Lawson, we reverse and render in part, affirm in part, and remand the case to the trial court for recalculation of prejudgment interest and entry of judgment in accordance with this opinion.

I. BACKGROUND FACTS

In 1996, Ruth, her daughter Ruth Ann, and Ruth Ann's daughter Erika formed ARI for the purposes of building, owning, and operating a Motel 6 in Decatur, Texas.[1] Each woman owned one hundred shares of ARI's stock and served as a company officer. ARI was authorized to issue one thousand shares of stock, but only three hundred were issued at this time.

Appellees began negotiating a deal with Motel 6. A Motel 6 representative told Appellees that they could build a Motel 6

---

1. For convenience, we will refer to ARI and its principals collectively as "Appellees," and, where necessary, individually.

with a ten-percent down payment and a ninety-percent loan. Appellees purchased a Motel 6 franchise. Motel 6 recommended that Appellees contact The Money Store, a Colorado lending institution, to seek financing for their project because that lender had provided loans on other Motel 6 projects. At the time Appellees purchased the franchise, a Motel 6 project cost $1.2 to $1.4 million. The Money Store prequalified Appellees for a $576,000 loan. Contrary to what the Motel 6 representative had told Appellees, however, The Money Store required a twenty-percent down payment on a Motel 6 loan. Appellees learned that a twenty-percent down payment was a standard requirement for start-up companies in this type of venture. Although Appellees' franchise agreement with Motel 6 expired on August 30, 1997, Motel 6 was willing to move forward with the Decatur Motel 6 project if ARI began construction on the motel during 1998. By the end of 1997, the cost of a Motel 6 project had risen to $1.8 million. According to Ruth Ann, at that time ARI was willing and able to pay twenty percent down on a $1.8 million loan.

In December 1997, in a further attempt to secure financing for a Motel 6 project, Ruth Ann contacted CNB. At that point, Appellees had never been formally rejected for a loan. Ruth Ann spoke by telephone with Don Lawson, a business development officer at CNB. She informed Lawson that ARI wanted to borrow money to build a Motel 6, forwarded a business proposal to him, and told him that ARI preferred a ninety-percent loan, but that it was open to other options because the principals wanted to build a Motel 6.

Meanwhile, Boyd L. Stewart, national sales director for Bed & Bath Inns Inc. (Bed & Bath), met with Doug Sanders, executive vice president of CNB. Stewart wrote a follow-up letter to Sanders on January 2, 1998, expressing "thanks for the efforts and support coming from [Sanders] and Ray[mond Dickerson]," CNB's president. The letter discussed a past joint meeting with A.J. Lambert about his land and a meeting with Larry Barnes, a client of CNB and potential franchisee of Bed & Bath. It also indicated Bed & Bath's plan to have the second meeting with Barnes at the Gainesville, Texas Bed & Bath Inn, emphasizing that "[t]he Gainsville property shows well and always creates heightened interest on the part of the buyer." Stewart stated in the letter that he "believ[ed] enough Bed & Bath Inn projects could be completed in the first six months of 1998" to "significantly impact the aggressive revenue goal [Sanders] and Ray ha[d] set for [CNB]." This letter was followed by a business presentation to more CNB employees on January 14, 1998. Lawson attended this presentation.

On January 21, 1998, Ruth Ann met with Lawson for thirty minutes at CNB. Lawson told her that ARI could not finance a $1.8 million Motel 6 project with a down payment of only ten percent. He also claimed at trial that she told him that ARI did not want to put more than $140,000 down.

Lawson testified that he thought the Bed & Bath presentation he had attended a week earlier was "hit or miss," and he "didn't buy into the Bed & Bath sales pitch." Despite his misgivings, without divulging any information about his or CNB's prior relationship with Bed & Bath, or any of his own doubts about Bed & Bath's claims, Lawson informed Ruth Ann about Bed & Bath, a less expensive motel chain, gave her a copy of the Bed & Bath brochure he had received from Bed & Bath, and discussed it with her. He suggested that ARI consider the Bed & Bath project, telling Ruth Ann that a Bed & Bath motel would cost less and could be

built faster than a Motel 6. Lawson also told Ruth Ann that CNB would extend a U.S. Small Business Administration (SBA) loan on the Bed & Bath project, but not on another project. When Lawson recommended Bed & Bath to Appellees, neither Lawson nor CNB had conducted any due diligence regarding the company, investigated whether the information in the brochure was correct, or determined the creditworthiness of Bed & Bath. At trial, Lawson ultimately admitted that based on its assets and those of its principals, ARI could have come up with enough money for a twenty-percent down payment for the Motel 6 project.

A few weeks after receiving the Bed & Bath franchise information from Lawson, Appellees met with Doug Biter, a Bed & Bath representative. During their two-hour meeting, Appellees discussed the project with Biter and further reviewed Bed & Bath literature. At a later meeting with Biter, Appellees toured the Gainesville facility. Appellees had numerous telephone conversations with Bed & Bath representatives and received and reviewed additional literature from Bed & Bath.

On February 20, 1998, ARI submitted a detailed investment proposal to CNB. On March 4, 1998, CNB sent Appellees a letter indicating that it had "agreed to pursue approval for [the] loan request for the acquisition of real estate and construction of a Bed & Bath Inn in Decatur, Texas," providing the terms for the loan, and requesting $3,500 in earnest money before assembling the loan package. Only after receiving this document did ARI purchase a Bed & Bath franchise for $25,000. CNB approved the $600,000 loan on March 17. The projected cost to complete the Bed & Bath project was $750,000.

Although CNB approved the $600,000 loan in the middle of March, it did not close on it until September 23, 1998, five months later. During those five months, Lawson and CNB executive vice president Doug Sanders, the officer responsible for ARI's loan, attempted to obtain required financial information from Bed & Bath. Because Bed & Bath would not cooperate, Lawson wrote a memorandum to Bed & Bath requesting year-end (1997) balance sheets, income statements, tax returns, and other financial documents. The memo read, in part:

> We have sent several referrals to you for this project. We feel there are many more that we would send, but are starting to lose our enthusiasm by having to work so hard at getting initial information from you. This is considered an urgent problem to Doug and I. We could be on the verge of losing a deal we switched from Motel 6 to you because of the delay.

Testimony showed that CNB never gave a copy of this memo, or otherwise shared the information contained in it, with Appellees. The memorandum itself does not reflect that ARI was a recipient of this memo or that it received a carbon copy of it. Appellees learned about the memo after discovery began in this lawsuit.

On May 25, 1998, Bed & Bath still had not sent the requested financial information to CNB, and Lawson sent Bed & Bath another memo stating that CNB would not go forward on any other Bed & Bath project and would not recommend any other Bed & Bath projects until Bed & Bath performed on ARI's project. Ultimately, the only financial statements CNB ever received from Bed & Bath were unaudited financial statements of Amerimation, Inc., the parent company of Bed & Bath, which showed that Amerimation earned only $68,000 in income in ten months of operation. At trial, Lawson stated that he did not ask for audited financial statements because they are expensive. However, the

Bed & Bath brochure specifically identified Bed & Bath's accounting firm and CPA. There is no indication that CNB or Lawson ever asked either the Bed & Bath personnel or their accountants whether audited statements were already available. Ruth Ann testified that had she known CNB was losing enthusiasm for the project and was not going to recommend anyone else to Bed & Bath, ARI would have pulled out of the deal.

The parties executed numerous agreements in connection with the project. In July 1998, two months before the closing, ARI entered into a franchise agreement and a motel construction agreement with Bed & Bath. The franchise agreement provides that ARI "conducted an independent investigation of the business." The motel construction agreement provides, in pertinent part:

> 3.3 Payment Schedule. Attached is a Schedule of Payments covering the various divisions of the Work to be done under this Agreement. This Schedule of Payments shall aggregate the total Contract Sum. Owner agrees to pay the amounts specified within 24 hours of such draw request as set forth in the Schedule of Payments. The Schedule of Payments may be amended by Contractor in the event of a Change Order agreed to by the parties, and/or in the event allowances are exceeded as provided for in the attached Plans and Specification.

The schedule provides that twenty-five percent ($162,500) of the contract sum ($650,000) was due at the time the agreement was signed. The printed date of the contract was July 9, 1998.

On September 21, 1998, ARI entered into a construction loan agreement with CNB, which Bed & Bath's representative also signed. The agreement expressly provides that any action taken by CNB to inspect the project or review the plans was done for its own protection and not for the benefit of ARI. However, the agreement also provides that "[d]uring the term of the construction, the provisions of this Loan Agreement shall control in the event there are any conflicts with any provision of any instrument, document, or writing referenced herein." The agreement additionally states that the funds will be advanced on a percentage-of-completion basis for "costs of labor performed and materials furnished." The three ARI principals pledged their three hundred shares of ARI stock and other assets as collateral for the loan.

Several days before the closing of ARI's loan, and without ARI's knowledge, CNB hired FAS Disbursement, L.L.C. (FAS), a construction management firm, to review the Bed & Bath project. CNB had an ongoing relationship with FAS. On September 17, 1998, one week prior to closing, FAS sent its pre-construction initial project review to CNB. The $1,000 fee for this review was paid out of ARI's funds.

In the review, FAS raised concerns about the Bed & Bath project, particularly about the $162,500 advance due before any work was performed on the project. FAS recommended that, to ensure the work was actually being performed, CNB pay Bed & Bath only as it completed the work. CNB did not send a copy of the report or disclose any of FAS's concerns to Appellees. Sanders admitted that if CNB had made ARI aware of this information, ARI could have chosen not to close on the loan, no harm would have occurred, and all parties could have gone their separate ways.

Four days before the loan closed, Appellees told CNB that they were not going to close the loan. CNB requested that Appellees come to the bank to discuss the

matter. Although not invited by Appellees, a Bed & Bath representative appeared at the meeting. CNB executive vice president Doug Sanders, CNB vice president Linda Hestilow, and Don Lawson were also present at the meeting. During the meeting, the CNB officers told Appellees that there was no reason to be afraid of the project, that it was a good deal, and that ARI should go forward with it. The bankers convinced ARI to go forward with the project. There was *no* mention about FAS's or CNB's concerns about the $162,500 advance.

The loan closed on September 23, 1998. CNB continued to conceal from ARI the stated concerns of FAS about Bed & Bath, and ARI did not learn of those concerns until after this suit was filed. Additionally, at all times leading up to the closing, CNB represented to ARI that a performance bond would be in place to protect ARI's interests. A bond was obtained and in the file at the time of closing. During the closing, CNB for the first time told ARI that *no* performance bond was needed. Instead, CNB told ARI that CNB had hired FAS and assured ARI that FAS was just as good as a performance bond. CNB returned the performance bond to the issuer within thirty days of closing. ARI agreed in writing to allow FAS to act as CNB's agent in making construction cost loan disbursements on the project. This is the only agreement between FAS and ARI. One specific provision outlining FAS's obligations to ARI reads as follows:

*Important:* [FAS] is working solely for [CNB] as its administrative agent .... [FAS's] sole obligations with respect to this project is to [CNB,] and [FAS] has no contractual obligation to [ARI], or to [ARI's] contractor (or to their subcontractors/vendors/design professionals/consultants), or to any other third party. [FAS's] review of the plans and specifications and of any project docu-

mentation for [CNB] shall not be construed as a representation by [FAS], or by [CNB], as to the content, completeness, quality, correctness, or sufficiency of such documents. [ARI] and its contractors are responsible for all independent architectural, engineering and other expert inspection and observation.

The day after closing, FAS told CNB that Bed & Bath had still not adequately addressed FAS's concerns about the $162,500 advance payment. CNB forwarded FAS's letter to Bed & Bath. Ten days later, Bed & Bath sent a letter to Doug Sanders at CNB which stated, in part:

I *strongly request* your bank's funding of our initial payment $162,500 today, so that we may immediately go forward in fulfilling our responsibilities to our mutual client .... *Doug, there are a number of other business opportunities I would like to discuss with you later this week or next. I will call you so that we may coordinate.* [Emphasis added.]

The next day, ignoring FAS's warnings, CNB authorized release of $162,500 to Bed & Bath. Ruth Ann had also authorized the release, unaware of CNB's and FAS's concerns. In the SBA form documenting the release of the funds, CNB represented to ARI that it was advancing the $162,500 based on Bed & Bath furnishing a breakdown of expenses before the next draw date. Based on this representation, ARI signed the form.

Sanders contended at trial that CNB paid the $162,500 because the advance was required by the construction agreement between Bed & Bath and ARI. Sanders later acknowledged that the construction loan agreement between ARI and CNB only allowed funds to be advanced for work performed, and that the construction loan agreement controlled if there was a

conflict with any other document, including the construction agreement between Bed & Bath and ARI. He admitted that CNB was responsible for obtaining documentation from Bed & Bath concerning how the money would be spent. CNB did not obtain such documentation before it advanced the $162,500, nor did it obtain the documentation before the next draw was made in February 1999. At trial, Sanders admitted that when CNB authorized the February 1999 draw, the bank still had no idea where or how any of the money it had already advanced to Bed & Bath had been spent.

Gary Quandt, FAS's project manager, testified that from the initial $162,500 advance, Bed & Bath took $43,685 as profit. The total anticipated profit for Bed & Bath for the whole project was $49,702. Accordingly, from the initial advance of $162,500, Bed & Bath realized 89% of the anticipated profit on the project before it had even begun construction.

As construction progressed, Bed & Bath submitted future payment requests directly to CNB, which in turn forwarded the requests to FAS for review and confirmation of the completed work. Once approved by FAS, CNB paid the later draw requests, but only after written authorization from ARI for each disbursement. ARI admitted at trial that it received Bed & Bath's draw requests and FAS's recommendations on the later draw requests.

At the closing, ARI had signed an "SBA Authorization" which obligated CNB to "[o]btain lien waivers or releases from all materialmen, contractors, and subcontractors involved in the construction." Sanders explained at trial that one of the reasons a lender should obtain lien waivers is to ensure that the money is actually spent on the project.

On February 23, 1999, FAS sent CNB another report regarding Bed & Bath's request for a second advance. FAS objected to any more funds being paid to Bed & Bath until CNB obtained information supporting the initial advance. FAS also recommended that CNB obtain unconditional lien releases prior to funding this second draw request and informed CNB that FAS had not received any lien releases in connection with the initial $162,500 advance. Again, ARI was never informed about any of these concerns. Despite FAS's objections, CNB continued to make advances to Bed & Bath over the next several months and never pursued or obtained any lien waivers on the project.

On direct examination at trial, CNB vice president Linda Hestilow claimed that she sent FAS's February 23, 1999 report to ARI via letter to Ruth Ann Taylor. Under cross-examination, however, Hestilow admitted that the FAS report was issued one day *after* she sent her letter to Ruth Ann.

Construction began in December 1998. Thereafter, subcontractors began appearing at the principals' homes and places of employment, complaining that they had not been paid and demanding payment. Materialmen and mechanic's liens were filed against the property. Ultimately, Bed & Bath abandoned the construction project, and the project failed. Because CNB had returned the performance bond less than thirty days after closing, no performance bond was in place.

CNB foreclosed on the project, including the real estate purchased by ARI outside the loan as well as the pledged ARI stock, and sold the stock at a public auction to LAR, a company formed by CNB three days before the foreclosure. Richard Barajas, a bank officer, was named the sole shareholder, sole director, and president of the company. Doug Sanders was named

the secretary. But one day before the public auction, the ARI principals caused ARI to issue each of them 200 additional shares of ARI stock, resulting in 900 shares outstanding. Ruth Ann admitted that this action was taken to prevent LAR from taking control of ARI. After LAR purchased the three hundred original shares of stock at the public auction, it sent a letter to Appellees claiming to be the sole owner of ARI and demanding all of ARI's books and documents. The SBA ultimately reimbursed CNB seventy-five percent of the bank's money advanced to Bed & Bath and also paid CNB's and Lawson's legal fees in this case.

ARI filed suit against Bed & Bath and later brought a separate suit against CNB, its affiliate LAR, Lawson, and FAS. ARI's original petition alleged DTPA, fraud, negligence, and negligent misrepresentation causes of action. Those suits (which were later consolidated) form the basis of this appeal. At the close of evidence, the trial court rendered a directed verdict that Don Lawson was acting in the course and scope of his employment at CNB and that CNB was therefore vicariously liable for his acts. Similarly, based on the jury's conspiracy finding, the trial court found that CNB and Bed & Bath were liable for each other's acts, and ordered Bed & Bath to pay contribution to CNB for 38% of any amount paid by or on behalf of CNB to ARI, plus interest. Finally, the judge entered a default judgment against Bed & Bath, and, in accordance with the jury's findings, rendered judgment that Appellees take nothing from FAS. CNB, Lawson, and LAR timely appealed from the trial court's judgment.

## II. Legal Analysis

### A. DTPA Claims

CNB contends in its second issue that the trial court abused its discretion by allowing ARI to recover under the DTPA because ARI's Bed & Bath project involved total consideration of more than $500,000; consequently, CNB concludes, the DTPA does not apply to ARI's lawsuit. ARI contends that, because CNB advanced only $463,193.45 to ARI under its $600,000 note, the DTPA does apply. Section 17.49(g) of the Act provides the following exemption:

Nothing in this subchapter shall apply to a cause of action arising from a *transaction, a project, or a set of transactions* relating to the same project, involving *total consideration by the consumer of more than $500,000*, other than a cause of action involving a consumer's residence.[2]

■ Based on the parties' representations and our own review of the law, this appears to be the first time that this subsection has been discussed in an appellate opinion. However, in a 1995 law review article, the authors, who include Senate and House co-sponsors of the bill resulting in the above section, point out:

The reform law has eliminated many high-dollar transactions from the reach of the DTPA. These changes were part of lawmakers' efforts to maintain the DTPA as a viable source of relief for consumers who encounter and are harmed by unscrupulous business practices, but to remove from the scope of the Act ... litigation between big businesses.[3]

The authors interpret the section to mean that "the DTPA will no longer govern transactions in which the overall consider-

2. TEX. BUS. & COM.CODE § 17.49(g) (Vernon Supp.2004) (emphasis added).

3. Teel Bivins et al., *The 1995 Revisions to the DTPA: Altering the Landscape,* 27 TEX. TECH L.REV. 1441, 1447 (1996).

ation exceeds $500,000."[4]

In their briefs, the parties provide conflicting interpretations of the meaning of "total consideration by the consumer,"[5] with CNB contending that the promissory note of $600,000 alone bars a DTPA recovery and ARI contending that its consideration included only the unpaid principal and accrued interest due on the note at the time of foreclosure, $463,193.45. Under Texas case law, "[c]onsideration is a present exchange bargained for in return for a promise. It consists of either a benefit to the promisor or a detriment to the promisee."[6] Similarly, in the sixth edition of *Black's Law Dictionary, consideration* is defined as "[s]ome right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other," and pecuniary consideration is "consideration for an act of forbearance which consists either in money presently passing or in money to be paid in the future."[7]

■ For this case, however, we do not need to determine whether "consideration" as used in the statute involves only detriment actually incurred by the consumer or detriment that a consumer promises to incur in the future. The balance of principal and accrued interest due on the note at the time of foreclosure was $463,193.45. Additionally, ARI paid $22,006.08 in interest on the note before defaulting. Finally, ARI paid $122,096.81 to CNB at the time of closing, $90,000 of which went to purchase the lot on which the motel would be built. Thus, looking only at the detriment ARI had incurred at the time of foreclosure, we can easily say that ARI's overall consideration exceeded $500,000 on the Bed & Bath project.

Because ARI's consideration exceeded $500,000, and because the project did not involve a consumer's residence,[8] the DTPA does not apply to ARI's cause of action regarding the project. Consequently, the trial court abused its discretion in submitting the DTPA jury question and in allowing ARI to recover from CNB under the DTPA.[9] Furthermore, the awards of trial and appellate attorney's fees were also in error, because attorney's fees are not recoverable for any other theory of recovery alleged by Appellees. We sustain CNB's second issue.

Lawson contends in his first issue that because ARI elected to recover against CNB under the DTPA, and because the jury made no DTPA liability finding against him, the trial court erred in awarding any judgment against him. There is no indication in the trial court's judgment that the judge applied the jury's DTPA liability finding against CNB to Lawson. For example, the judgment assesses no attorney's fees against Lawson. Additionally, as we hold below, the trial court properly awarded damages against Lawson for fraud. We therefore overrule Lawson's first issue.

## B. Fraud Claims

■ Because multiple theories of liability were submitted to the jury, if the ver-

---

4. *Id.* at 1453.

5. Tex. Bus. & Com.Code § 17.49(g).

6. *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 496 (Tex.1991).

7. Black's Law Dictionary 306–07 (6th ed.1990).

8. *See* Tex. Bus. & Com.Code § 17.49(g).

9. *See State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex.1975); *In re Talco–Bogata Consol. Indep. Sch. Dist. Bond Election,* 994 S.W.2d 343, 347 (Tex.App.-Texarkana 1999, no pet.).

dict in favor of ARI can be sustained under more than one theory, then this court is required to use the findings affording ARI the greatest recovery and render judgment accordingly.[10] Sustaining the verdict under the theory of fraud would afford ARI the greatest recovery because of the inclusion of exemplary damages; the theories of negligence and negligent misrepresentation do not involve exemplary damages. Additionally, the finding in response to Question 7, a proportionate responsibility question addressing all causes of action against all defendants, allows ARI a maximum recovery of 93% of its actual damages and all exemplary damages awarded.[11] We therefore analyze the fraud issues next.

### 1. CNB

■■■ CNB argues in its third issue that the evidence is legally insufficient to support the jury's finding of fraud. CNB's only challenges to the evidence of its fraudulent nondisclosures, however, are ARI's alleged contractual waivers or releases. That is, CNB claims that ARI acknowledged in several written agreements (1) that it was not entitled to certain undisclosed information; (2) that it was not relying on CNB to provide the undisclosed information; and (3) that CNB owed no duty to provide the undisclosed information. A contractual waiver must be knowing to be valid.[12] Similarly, a release must clearly and specifically disclaim reliance.[13] We have reviewed each of the agreements in this case—the franchise agreement, the note, the construction loan agreement, and the FAS agreement—and are unpersuaded by CNB's contentions.

The franchise agreement that ARI signed with Bed & Bath provides that ARI "conducted an independent investigation of the business." This document arguably limited Bed & Bath's duties to ARI; it did nothing to limit CNB's scope of duty to ARI.

The consulting agreement ARI signed to allow FAS to act as CNB's agent in making construction cost loan disbursements on the project provides:

*Important:* [FAS] is working solely for [CNB] as its administrative agent.... [FAS's] sole obligations with respect to this project is to [CNB,] and [FAS] has no contractual obligation to [ARI], or to [ARI's] contractor (or to their subcontractors/vendors/design professionals/consultants), or to any other third party. [FAS's] review of the plans and specifications and of any project documentation for [CNB] shall not be construed as a representation by [FAS], or by [CNB], as to the content, completeness, quality, correctness, or sufficiency of such documents. [ARI] and its contractors are responsible for all independent architectural, engineering and other expert inspection and observation.

While this documents did absolve FAS of any duty to disclose to ARI, it did not absolve CNB of its duty to disclose material information that it gained from FAS.

Similarly, the note includes ARI's agreement "to take all necessary steps to administer, supervise, preserve, and protect the Collateral; and regardless of any action taken by [CNB], there shall be no duty upon [CNB] in this respect," and the construction loan agreement expressly

---

**10.** *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex.1987).

**11.** *See id.*

**12.** *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 844 (Tex.2000).

**13.** *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180–81 (Tex.1997).

provides that any action taken by CNB to inspect the project or review the plans was done for its own protection and not for the benefit of ARI. While these documents provide that CNB has no duty to protect the collateral, they do not contain a specific, valid release or waiver executed by ARI that would allow CNB to withhold material information that it received from Bed & Bath or FAS.

Because CNB has pointed us to no evidence that shows ARI executed a specific, valid contractual release or waiver that in any way absolved CNB of its duty to disclose to ARI such material information as Bed & Bath's failure to provide adequate financial statements, CNB's reluctance to direct any more customers to Bed & Bath because of Bed & Bath's failure to provide financial information, FAS's recommendation that the initial advance not be made before any work was completed, and Bed and Bath's failure to ever document how that initial advance was spent, we hold that the evidence is legally sufficient to uphold the jury's finding of fraud. Having found that the evidence is legally sufficient to uphold the jury's finding of fraud based on CNB's nondisclosures of material information to ARI, we do not reach CNB's challenge to the legal sufficiency of the evidence of fraud based on CNB's misrepresentations.[14] We overrule CNB's third issue.

## 2. Lawson

■ In his second issue, Lawson contends that the trial court erred in not ruling that ARI's claims were barred as a matter of law on the basis of contractual waiver, ratification, and/or estoppel. ARI responds that Lawson failed to raise this issue below and failed to provide any record citation to a ruling or opportunity to rule. In a jury trial, a matter-of-law issue must be preserved through a motion for instructed verdict, a motion for judgment notwithstanding the verdict ("n.o.v."); an objection to the submission of the question to the jury; a motion to disregard the jury's answer to a vital fact question; or a motion for new trial.[15]

■ While Lawson made some objections to the jury charge and filed a motion for judgment n.o.v., a motion to disregard, and a motion for new trial, none of these documents mention Lawson's second issue on appeal. Further, the record citations that Lawson provided in his brief and reply brief do not show that the trial court was presented with any specific request to rule that ARI's fraud claims were barred by the properly pled affirmative defenses of waiver, ratification, or estoppel.[16] Because Lawson failed to preserve this issue in the trial court, his complaint is waived. We overrule his second issue.

■ In his third and fourth issues, Lawson argues that the evidence is legally and factually insufficient to support the fraud finding because he had no duty to disclose the concealed information to Appellees and because the information was immaterial. For there to be actionable fraudulent nondisclosure, there must be a duty to disclose.[17] Whether such a duty

14. *See* Tex.R.App. P. 47.1.

15. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex.1992); *Salinas v. Fort Worth Cab & Baggage Co.*, 725 S.W.2d 701, 704 (Tex.1987); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at*

*"No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 530 (1991).

16. *See* Tex.R.App. P. 33.1(a).

17. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex.2001).

exists is a question of law.[18] A duty to disclose may arise in a commercial context in four situations: 1) when there is a fiduciary relationship between the parties; 2) when one voluntarily discloses information, the whole truth must be disclosed; 3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; or 4) when one makes a partial disclosure and conveys a false impression.[19] There was no fiduciary relationship between Lawson and Appellees.[20]

■ When pitching the Bed & Bath project to Appellees, however, Lawson did not disclose CNB's prior relationship with Bed & Bath, his ambivalence about Bed & Bath's ability to deliver on the profits it promised to CNB from their business relationship, or the fact that neither CNB nor he himself had investigated Bed & Bath's financial condition. We hold that the evidence establishes that Lawson had a duty to fully disclose this information under the second scenario described above, and he breached that duty.

After the loan was approved, Lawson sought required financial information from Bed & Bath so construction could begin. Bed & Bath did not respond. On April 8, 1998, Lawson wrote to Bed & Bath and requested year-end 1997 balance sheets, income statements, tax returns, and financial documents. His memo read, in part:

> As you can understand, we are expected by our customers and SBA to do our due diligence to assure that you can perform on your commitment to the franchisee. Ruth Narramore is also calling and wanting to know what the hold up is on construction and I, quite frankly[,] don't have an answer. We have sent several referrals to you for this project. We feel there are many more that we would send, but are starting to lose our enthusiasm by having to work so hard at getting initial information from you. This is considered an urgent problem to Doug and I. We could be on the verge of losing a deal we switched from Motel 6 to you because of the delay.

The evidence shows that Lawson did not provide copies of this memo to ARI or tell ARI that CNB was losing enthusiasm for the project or that an "urgent problem" existed because Bed & Bath would not send legitimate financial information to CNB. Further, Bed & Bath *never* fully complied with CNB's demands. Lawson admitted that he never received the tax returns he requested. Lawson also admitted that the tax returns he sought would have been a reliable source to verify Bed & Bath's income.

On May 26, 1998, having still not received the requested information, Lawson sent Bed & Bath another memo stating that CNB would not go forward with any other Bed & Bath projects until Bed & Bath performed on the ARI project. Lawson did not give this memo to ARI and did not disclose to ARI that CNB was no longer recommending Bed & Bath to its customers. Ruth Ann testified that she never saw or received a copy of either

**18.** *Id.*

**19.** *Lesikar v. Rappeport,* 33 S.W.3d 282, 299 (Tex.App.-Texarkana 2000, pet. denied); *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 635–36 (Tex.App.-San Antonio 1993, writ denied).

**20.** *See Mfrs. Hanover Trust Co. v. Kingston Investors Corp.,* 819 S.W.2d 607, 610 (Tex. App.–Houston [1st Dist.] 1991, no writ); *Nautical Landings Marina, Inc. v. First Nat'l Bank,* 791 S.W.2d 293, 299 (Tex.App.-Corpus Christi 1990, writ denied).

memo before Appellees filed suit. In a letter dated May 25, the day before this memo to Bed & Bath, Lawson informed ARI of the information that would be needed to close the loan and made no reference to the problems with Bed & Bath.

 Lawson argues that, at most, the statements he made in the memos described his feelings or opinion that CNB employees were beginning to feel frustrated with Bed & Bath's unwillingness to provide needed documentation. Whether a statement is an actionable statement of "fact" or merely an innocuous statement of "opinion" often depends on the circumstances in which a statement is made.[21] Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future.[22] Here, Lawson testified that, in fact, CNB was starting to lose enthusiasm for the project. He said that when he wrote the April 8, 1998 memo mentioning CNB's loss of enthusiasm, he was "frustrated" with Bed & Bath, and his frustration was building. The jury could have found these two statements to be statements of fact, not mere opinion. CNB in fact was losing enthusiasm for the project, and Lawson in fact was frustrated with Bed & Bath.

 Lawson also argues that, regardless of a duty owed, the evidence shows that ARI was not ignorant of the substance of these memoranda. We disagree. The record shows that ARI knew Bed & Bath was not getting its "paperwork" in to CNB. Ruth Ann testified that CNB had told her that Bed & Bath was "slow in

getting their paperwork in." She also testified that Appellees wanted to back out of the deal one week before the loan closed because they "couldn't imagine how [the deal] could go forward if [Bed & Bath was] going to be this slow about getting the paperwork together." But she also testified that had Appellees known that CNB had lost enthusiasm for the project and was not going to recommend any other clients to Bed & Bath, they would not have closed on the deal.

As to Lawson's duty, the record shows that Ruth Ann said that ARI "couldn't figure out what the delay was" and "kept calling the bank asking them why" the loan had not yet closed. Lawson testified that he had phone conversations with the principals of ARI about CNB "having a problem getting current information" from Bed & Bath. The evidence shows that ARI was unaware of the nature of Bed & Bath's noncompliance and the urgency and importance Lawson placed on the noncompliance. Ruth Ann knew that Bed & Bath was slow in getting paperwork in, but she did not know about CNB and Lawson's loss of enthusiasm, frustration, and decision not to recommend Bed & Bath to others. Under the circumstances, Lawson provided only partial disclosures to Appellees. Lawson's partial disclosures left a false impression with Appellees that induced them to continue with the project and close the loan. Accordingly, we hold that Lawson did not meet his duty under the fourth scenario listed above.[23]

 Lawson contends that the alleged nondisclosures were immaterial. "Material" information is that which a reasonable person would attach importance to and would be induced to act on in deter-

---

**21.** *Transp. Ins. Co. v. Faircloth,* 898 S.W.2d 269, 276 (Tex.1995).

**22.** *Id.*

**23.** *See Hoggett,* 971 S.W.2d at 487.

mining his choice of actions in the transaction in question.[24] The record supports ARI's assertion that Lawson's nondisclosures were material. Ruth Ann testified that had ARI known that CNB and Lawson had lost enthusiasm for the project and were not going to recommend any other clients to Bed & Bath, ARI would have pulled out of the deal before closing.

Lawson argues that ARI had equal access to the financial information of Bed & Bath and that ARI had acknowledged in its franchise agreement with Bed & Bath that it performed its own independent investigation of Bed & Bath. That argument is irrelevant. The issue before us is not whether Lawson had informed ARI of Bed & Bath's financial condition, but whether Lawson made a fraudulent nondisclosure by not informing ARI of CNB and Lawson's concerns about Bed & Bath's failure to comply with CNB's requirements for the construction process. ARI did not have equal access to this information, which was located in CNB's files. We conclude that Lawson's acts of fraudulent nondisclosure were material.

Applying the appropriate standards of review,[25] we hold that the evidence is legally and factually sufficient to support the jury's finding of fraud. We overrule Lawson's third issue and that part of his fourth issue related to the fraud finding.

In his fifth issue, Lawson contends that the evidence is legally and factually insufficient to support the jury's finding that he is proportionately responsible for 15% of the damages suffered by Appellees. From our review of his brief, this issue is solely dependent upon a holding that the evidence is legally and factually insufficient to support the jury finding that Lawson committed fraud. Lawson offers no other arguments in support of this issue. Because we have already held that the evidence is legally and factually sufficient to support the jury finding that Lawson committed fraud, we overrule Lawson's fifth issue. We do not reach Lawson's sixteenth, seventeenth, eighteenth, and nineteenth issues as to negligence and negligent misrepresentation.[26]

### 3. Actual Damages

#### a. Out–of–Pocket Costs

CNB does not challenge the damages awarded ARI for its out-of-pocket costs ($172,102.89). In his seventh issue, however, Lawson contends that the evidence is legally and factually insufficient to prove that his actions proximately caused all of Appellees' actual damages from the lost project. Specifically, he claims that the franchise fee and loan application fee ($28,500) were paid before any alleged fraudulent conduct occurred and that the record does not show that the collapse of the project was foreseeable from any failure to reveal his frustration with Bed & Bath.

---

24. *See Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 338 (Tex.App.–Houston [14th Dist.] 1991, no writ).

25. *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002); *Bradford*, 48 S.W.3d at 754; *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); *Cont'l Coffee Prods. Co.*

*v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (all pertaining to legal standard); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965) (both pertaining to factual standard).

26. *See* TEX.R.APP. P. 47.1.

As we discussed above, the record shows that Lawson failed to disclose pertinent, material information from his first face-to-face contact with Ruth Ann Narramore. He testified that he thought the Bed & Bath presentation he had attended a week before he met with Ruth Ann was "hit or miss," and he "didn't buy into the Bed & Bath sales pitch." He nevertheless recommended the Bed & Bath project to Ruth Ann, gave her a copy of the Bed & Bath brochure he had received from Bed & Bath, and discussed it with her. At no point in this discussion did Lawson reveal any information about his or CNB's prior relationship with Bed & Bath or any of his own doubts about Bed & Bath's claims. He pushed the Bed & Bath project, telling Ruth Ann that a Bed & Bath motel would cost less and could be built faster than a Motel 6 and that CNB would extend a U.S. Small Business Administration (SBA) loan on the Bed & Bath project, but not on another project. When Lawson recommended Bed & Bath to Appellees, neither Lawson nor CNB had conducted any due diligence regarding the company, investigated whether the information in the brochure was correct, or determined the creditworthiness of Bed & Bath. At the time of this conversation, Appellees had paid neither the franchise fee nor the loan application fee.

Additionally, the jury heard evidence that if Appellees had known that CNB and Lawson had lost enthusiasm for the project and were not going to recommend any other clients to Bed & Bath, ARI would have pulled out of the deal before closing. We hold that the evidence was legally and factually sufficient to support a finding that Lawson's fraudulent nondisclosures, along with those of other defendants, proximately caused all of the damages resulting from the lost project. We overrule Lawson's seventh issue.

### b. Loss of Credit Reputation

In its first issue, CNB contends that the evidence is legally insufficient to support the jury award of $650,000 in damages for ARI's loss of credit reputation. In his sixth issue, Lawson contends that the evidence is legally and factually insufficient to support the award. More specifically, CNB and Lawson contend that no evidence exists as to causation or damages.

After defaulting on the CNB note, ARI received a demand letter from CNB informing it that it had eleven days to pay CNB approximately $17,000 or CNB would accelerate the note. In June 2000, within days of filing suit against CNB, Ruth Ann wrote a letter to Decatur Banking Center (DBC) "to get a loan to move this project forward and finish it." The letter, in its entirety, reads as follows:

> To: [DBC]
>
> From: [ARI]
>
> Re: Proposal is for a one year note to pay off [CNB] to prevent foreclosure.
>
> The contractor for the job took the money advanced and walked off the job. [ARI] needs time to finish the project (with a second lien after all estimates are in) or sell to a new operator.
>
> The loan amount needs to be $495,000 to pay off [CNB] to stall foreclosure.
>
> The project is located on Hwy 287N. It features 22 rooms and was expected to open December 1998. Estimated income for the property when open for business will be approximately $166,200 a year. With debt service at $66,000. These figures are at a 75% occupancy rate.
>
> Thank you for your time.

Nothing in the record shows that ARI sent the bank any shareholder credit reports, financial information, or a project description; pledged collateral or offered personal

guaranties as to loan repayment; or provided any other supporting information upon which DBC could base its review for extending a loan to ARI. In response to ARI's letter, DBC sent the following one-paragraph letter to Ruth Ann:

> Per our telephone conversation on this same date, First National Bank of Bowie will be unable to help [ARI] with its loan request. *The reasons are uncertainty regarding the ultimate completion of the project, the economic viability of the project, and suspect sources of repayment.*
>
> Thank you for the opportunity to look at this request. [Emphasis added.]

The record does not show that ARI attempted to obtain another loan from any other bank after becoming dissatisfied with CNB. Ruth Ann testified that before ARI's dealings with CNB, ARI was able to obtain at least a $600,000 loan, and after its dealings with CNB, it could not do so. Ruth Ann testified that ARI's credit had been damaged in at least the amount of $600,000. Ruth Ann also testified that she believed that because of ARI's dealings with CNB, ARI's credit reputation had been damaged. Ruth Ann's June letter to DBC, DBC's one-paragraph denial, and Ruth Ann's testimony constitute the entire body of evidence as to damaged credit reputation.

 Loss of credit is recoverable as actual damages in a suit where the damage to credit was the necessary and usual result of the defendant's action.[27] To show damage to its credit reputation, a plaintiff must show that its inability to obtain a loan "resulted in injury and proof of the amount of that injury."[28] Courts have found that actual damages are shown where a party's loan is actually denied or a higher interest rate is charged,[29] and where a party who could obtain a loan from a bank without collateral prior to a disagreement with a creditor may obtain a loan afterwards only if collateral or other condition is imposed.[30]

 ARI argues that DBC's letter refusing to lend ARI $495,000 was sufficient evidence of injury. We disagree. The crucial inquiry in this case is whether credit problems ARI suffered after Appellants' fraudulent conduct were different from any credit problems it experienced before Appellant's fraudulent conduct.[31] In making this inquiry, we must determine whether the circumstances under which ARI applied for credit after the conduct were the same or similar to the circumstances under which it applied before the conduct.[32] This inquiry requires us to look at a before-and-after picture of the circumstances under which ARI attempted to secure credit.

Looking at the "before" picture of ARI's credit capabilities, Ruth Ann testified that ARI had problems obtaining a loan before coming to CNB based on its desire to pay only ten-percent down. Although the record does not show what information ARI submitted to The Money Store to obtain its prequalification letter for $576,000, the record does show that ARI acknowledged

27. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 688 (Tex.1981); *Duval County Ranch Co. v. Wooldridge*, 674 S.W.2d 332, 336 (Tex.App.-Austin 1984, no writ) (extending *Mead* rationale to causes of action involving fraud).

28. *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex. 1998).

29. *Id.*

30. *See Roberts v. U.S. Home Corp.*, 694 S.W.2d 129, 134 (Tex.App.-San Antonio 1985, no writ).

31. *See id.*

32. *See id.*

that *all* of the applications it had made for loans through several lending institutions were based on the principals' personal credit histories and personal financial statements. Likewise, the only loan actually approved for ARI, the CNB loan, was approved based on the principals' personal credit histories and financial statements.

As to the "after" picture, the record shows that ARI sent a short letter to DBC asking for a $495,000 loan, and DBC refused in writing. Neither letter mentions anything about the principals' personal credit histories, personal financial statements, or equity investment. In addition, no evidence exists that Appellees submitted financial information, credit histories, or project descriptions or made collateral pledges or personal guaranties to DBC. At oral argument, ARI contended that DBC's reason for rejecting ARI's loan proposal based on "suspect sources of repayment" necessarily implied that the shareholders provided financial information to DBC. Because an inference based upon an inference does not constitute evidence,[33] the jury could not properly infer from the nature of DBC's letter that the principals had submitted their financial information with Ruth Ann Taylor's proposal letter and in turn infer that DBC had rejected the loan based on that information.

Applying the well established standard of review for legal sufficiency of the evidence,[34] we hold that the record contains less than a scintilla of evidence to enable the jury to conclude that ARI suffered any injury to its credit reputation. Ruth Ann's testimony that ARI's credit had been damaged was merely unsupported opinion.[35] ARI did not show any damage by establishing that prior to CNB's conduct it could obtain a loan with an equity investment, personal guaranties, and personal credit histories because the evidence does not show that ARI could not have obtained a loan from DBC after CNB's wrongful conduct if ARI had given the same credit information and made the same assurances.[36] A party cannot recover damages based on speculation or conjecture.[37] We sustain CNB's first issue and Lawson's sixth issue. Because we have sustained Lawson's sixth issue, we do not reach his eighth issue, which alternatively requests remittitur.

### 4. Exemplary Damages

### a. Clear and Convincing Evidence of Fraud

CNB does not challenge the exemplary damages award against it.

---

33. *Rounsaville v. Bullard,* 154 Tex. 260, 276 S.W.2d 791, 794 (1955); *see Lozano v. Lozano,* 52 S.W.3d 141, 148 (Tex.2001) (holding jury may not reasonably infer ultimate fact from meager circumstantial evidence merely raising any number of inferences, none more probable than another).

34. *Rocor,* 77 S.W.3d at 262; *Bradford,* 48 S.W.3d at 754; *Uniroyal Goodrich Tire Co.,* 977 S.W.2d at 334; *Cazarez,* 937 S.W.2d at 450; *Leitch,* 935 S.W.2d at 118; *In re King's Estate,* 244 S.W.2d at 661.

35. *See Auto. Ins. Co. v. Davila,* 805 S.W.2d 897, 908 (Tex.App.-Corpus Christi 1991, writ denied) (holding that the plaintiff's unsupported opinion that her credit "was ruined" was insufficient to support damages).

36. *See Roberts,* 694 S.W.2d at 135.

37. *See id.* (citing *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710 (1943) (stating that loss of earning capacity is best shown by comparing actual earnings before and after injury)); *Village Square Ltd. v. Barton,* 660 S.W.2d 556 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.) (stating that loss of value of business is impossible to ascertain without facts, figures, and data of the "going business" to compare with the present one).

Lawson argues in his fourth, tenth, and eleventh issues that the evidence of fraud is legally and factually insufficient to satisfy the clear and convincing standard. The Texas Civil Practice and Remedies Code requires a plaintiff seeking the recovery of exemplary damages resulting from fraud to establish the elements of fraud "by clear and convincing evidence." [38] For exemplary damages purposes, clear and convincing evidence is defined as that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." [39] This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. [40] While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. [41]

■ This higher burden of proof alters the appellate standard of legal sufficiency review. [42] In reviewing the evidence for legal sufficiency, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the allegations in the petition were proven. [43] We must review all the evidence in the light most favorable to the finding and judgment. [44] This means

that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. [45] We must also disregard all evidence that a reasonable factfinder could have disbelieved. [46] We must consider, however, undisputed evidence even if it does not support the finding. [47]

■ This higher burden of proof also alters the appellate standard of factual sufficiency review. [48] "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." [49] In considering whether the evidence rises to the level of being clear and convincing, we must determine "whether, on the entire record, a factfinder could reasonably form a firm conviction or belief" that the allegations in the petition were proven. [50]

The evidence most favorable to the verdict has already been detailed with reference to the fraud claim; it is also relevant to the exemplary damages finding. Because we are required, whether reversing or affirming the award, to detail all the evidence and explain why the jury's finding is supported by factually sufficient evidence or so against the great weight and preponderance of the evidence as to be manifestly unjust, we must also review any

**38.** Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a)(1) (Vernon 1997).

**39.** Id. § 41.001(2); accord Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex.1994).

**40.** In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 588 S.W.2d 569, 570 (Tex.1979); In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g).

**41.** Addington, 588 S.W.2d at 570.

**42.** In re J.F.C., 96 S.W.3d 256, 265 (Tex. 2002).

**43.** Id. at 266.

**44.** Id.

**45.** Id.

**46.** Id.

**47.** Id.

**48.** In re C.H., 89 S.W.3d 17, 25 (Tex.2002).

**49.** Id.

**50.** Id. at 28.

evidence and inferences that are against the verdict.[51]

■■■ The jury could have properly found by clear and convincing evidence that Lawson made fraudulent nondisclosures to Appellees that left them with a false impression as to the stability of the Bed & Bath project at a time when he knew they were considering backing out of the deal. The evidence further confirms that Lawson's nondisclosures resulted in a failed venture for Appellees. However, the jury also heard Ruth Ann's testimony that she believed Bed & Bath quite possibly fooled Lawson just as it had fooled ARI and that she did not think Lawson had intended to harm her or ARI. It further heard testimony that Appellees knew that Bed & Bath was not getting its paperwork in on time. Despite hearing this evidence favorable to Lawson, the jury chose to believe Appellees and found that the evidence clearly and convincingly showed that fraud had occurred.

Giving due deference to the jury's role in determining the weight and credibility to be given a witness's testimony, we hold that the jury's award of exemplary damages is supported by clear and convincing evidence. The evidence, therefore, is legally and factually sufficient to support an award of exemplary damages. Having held that the evidence is sufficient to support the jury's firm belief in the finding of fraud, we overrule Lawson's tenth issue and the remaining portion of his fourth issue. We also overrule that portion of his eleventh issue complaining of the sufficien-

cy of the evidence to support the fraud finding.

### b. Reasonableness of Amount of Damages

In his eleventh issue, Lawson argues that the evidence is legally and factually insufficient to support the exemplary damage award. In his twelfth issue, Lawson argues that the failure of part of the award of actual damages requires reversal of the exemplary damage award. In his thirteenth issue, he argues that the award violates constitutional, statutory, and common law constraints, and in his fourteenth issue, he alternatively argues that this court should order a remittitur.

■■■ This court reviews the excessiveness of an exemplary damages award under state law as a factual sufficiency challenge.[52] We may only reverse if the exemplary damages award is so against the great weight and preponderance of the evidence as to be manifestly unjust.[53] Exemplary damages are recoverable where, as here, a plaintiff proves by clear and convincing evidence that the harm for which he seeks exemplary damages resulted from fraud.[54] No set rule or ratio between actual and exemplary damages exists to determine whether an exemplary damages award is excessive.[55] Factors we consider in determining the reasonableness of an award include: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and

**51.** *Moriel,* 879 S.W.2d at 31; *Peco Constr. Co. v. Guajardo,* 919 S.W.2d 736, 742 (Tex.App.-San Antonio 1996, writ denied).

**52.** *Ellis,* 971 S.W.2d at 406; *Baribeau v. Gustafson,* 107 S.W.3d 52, 61 (Tex.App.-San Antonio 2003, pet. denied).

**53.** *Moriel,* 879 S.W.2d at 30; *Baribeau,* 107 S.W.3d at 61.

**54.** Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a)(1).

**55.** *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981).

(5) the extent to which conduct offends a public sense of justice and impropriety.[56]

Lawson's chief complaint is that the exemplary damages awarded do not relate to the nature of the wrong he allegedly committed, the extent or type of harm resulting from such conduct, the character of his alleged conduct, or the degree of culpability. The amount of exemplary damages awarded rests largely in the discretion of the jury.[57]

▮ Here, there was evidence from which the jury could have found that Lawson's nondisclosures involving his and CNB's worries as to Bed & Bath's failure to comply with their request for financial information were made with callous indifference to the effect of that failure on ARI. The jury had before it evidence that Lawson had on several occasions requested the information and had told ARI that Bed & Bath was not getting the paperwork in to CNB, but ARI had no knowledge of Lawson's and CNB's outlook on the project.

This degree of indifference toward ARI justified the award of exemplary damages. Furthermore, the nature of Lawson's actions and the degree to which this type of conduct must be deterred in the future support the award. The jury was properly instructed on the *Kraus* factors, and the record contains competent evidence to support the award. We hold that the evidence is factually sufficient to support the award. Evidence which is factually sufficient is necessarily legally sufficient.[58] We overrule the remaining portion of Lawson's eleventh issue and that portion of his thirteenth issue contending that the award violates Texas common law constraints.

The award also lies well within statutory and constitutional boundaries. The jury and trial court assessed against Lawson actual damages of $123,390.43. The exemplary damages awarded against him were $65,000. Because we have reversed the $650,000 damage award for loss of credit reputation, actual damages remaining against Lawson amount to $25,890.43.

▮ Allowing the $65,000 exemplary damage award against him to stand, even with actual damages reduced, does not violate statutory constraints. Section 41.008 of the Texas Civil Practice and Remedies Code provides:

(b) Exemplary damages awarded against a defendant may not exceed an amount equal to the *greater* of:

(1) (A) two times the amount of economic damages; plus

(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2) $200,000.[59]

▮ Even when an exemplary damages award is reasonable under governing state law, however, it may violate a party's substantive due process right to protection from "grossly excessive" damages.[60] To determine whether an award is "grossly excessive," a reviewing court considers "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between actual and punitive damages; and

---

**56.** Tex. Civ. Prac. & Rem.Code Ann. § 41.011; *Kraus,* 616 S.W.2d at 910.

**57.** *S.W. Inv. Co. v. Neeley,* 452 S.W.2d 705, 708 (Tex.1970); *Gray v. Allen,* 41 S.W.3d 330, 332 (Tex.App.-Fort Worth 2001, no pet.); *Transmission Exch., Inc. v. Long,* 821 S.W.2d 265, 272 (Tex.App.-Houston [1st Dist.] 1991, writ denied).

**58.** *Baribeau,* 107 S.W.3d at 63.

**59.** Tex. Civ. Prac. & Rem.Code Ann. § 41.008(b) (Vernon Supp.2004) (emphasis added).

**60.** *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809 (1996); *Baribeau,* 107 S.W.3d at 63.

(3) a comparison of the punitive damages awarded and other civil or criminal penalties that could be imposed for similar conduct." [61]

■ The record reflects ample evidence that Lawson callously disregarded the effects that the information he concealed about Bed & Bath would have on Appellees. Lawson's level of misconduct supports the award.

The disparity between the exemplary damages and actual damages as reduced by this court also supports the award. The ratio of exemplary damages to actual damages is slightly more than 2.5 to 1. Although the precise award in any case must be based upon its particular facts and circumstances, the U.S. Supreme Court has noted that we have "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." [62] Based on the evidence, the exemplary damages assessed against Lawson reasonably accomplish the purpose of punishing Lawson and deterring others. [63]

Finally, under the third guidepost, we note that the jury could have awarded damages against Lawson of up to $200,000. [64] This comparison also supports the award. We hold that the award of exemplary damages against Lawson does not violate statutory, constitutional, or common law constraints. We overrule the remaining portion of Lawson's thirteenth issue.

In his twelfth issue, Lawson contends that we should reverse the exemplary damages award because of the failure of part of the original actual damage award. In his fourteenth issue, he requests that we suggest a remittitur. Because we have held that the award does not violate any state or federal constraints and that the evidence is factually sufficient to support the award, we see no basis for reversal or remittitur. [65] We overrule Lawson's twelfth and fourteenth issues.

## C. Prejudgment Interest

■ In CNB's fourth issue and Lawson's fifteenth issue, they contend that the trial court abused its discretion in calculating prejudgment interest. The trial court computed the amount of prejudgment interest from October 10, 1999, the date the initial suit was filed against Bed & Bath. CNB and Lawson contend that the accrual date should have been June 9, 2000, the date ARI filed a separate suit against them, even though their suit later was consolidated with the Bed & Bath suit. We agree.

■ An award of prejudgment interest advances two ends: 1) achieving full compensation to plaintiffs; and 2) expediting both settlements and trials. [66] The two legal sources for a prejudgment interest

**61.** *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 45 (Tex.1998) (adopting *Gore* factors).

**62.** *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003).

**63.** *See Malone,* 972 S.W.2d at 39–40.

**64.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.008(b).

**65.** *See Campbell,* 123 S.Ct. at 1526, 538 U.S. 408 (reversing exemplary damages award that violated defendant's due process rights); *Moriel,* 879 S.W.2d at 30 (stating that we can only reverse exemplary damages if evidence is factually insufficient).

**66.** *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985), *modified on other grounds, Johnson & Higgins, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 530 (Tex. 1998).

award are 1) general principles of equity, and 2) an enabling statute.[67] The enabling statute, Texas Finance Code section 304.104, only applies to wrongful death, personal injury, and property damage cases.[68] Where no statute controls the award of prejudgment interest, the decision to award prejudgment interest is left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making this decision.[69] However, once the trial court decides to award equitable prejudgment interest, the trial court must follow the accrual rule set forth in the enabling statute.[70] Consequently, regardless of whether prejudgment interest is awarded pursuant to the Texas Finance Code or common law, it does not accrue until the earlier of 1) 180 days after the date a defendant receives written notice of a claim against it, or 2) the date the suit was filed.[71]

The parties have directed us to no evidence that CNB and Lawson received written notice of claims against them until the date suit was filed against them. The fact that CNB and Lawson asked that their case be consolidated with the Bed & Bath suit is of no consequence to the correct accrual date for computing prejudgment interest; the consolidation occurred after suit against CNB and Lawson was filed.

In a similar case, the Austin Court of Appeals explained:

Here, the purpose of encouraging settlements would not be served if prejudgment interest began to run from December 12, 1997, the date AT & T filed suit

against Qwest and C & S, because CK had received no notice at that time that AT & T asserted a claim against it. On January 23, 1998, the date C & S sued CK, CK received notice and an opportunity to settle the claim with C & S; however, AT & T had yet to present notice to CK of a claim; as of this date CK was a named defendant only as to C & S. Nelson had not yet been named as a defendant. AT & T argues that because the district-court judgment found Qwest and C & S jointly and severally liable to AT & T for the damages caused by CK, prejudgment interest should begin to run against CK on December 12, 1997. AT & T posits that by virtue of this holding, it would have been entitled to the damages caused by CK from Qwest and C & S without suing CK and prejudgment interest would have run from December 12, 1997. Therefore, it should not be penalized for filing suit against CK, which would result from designating the May 5, 2000 date as the date that prejudgment interest began to run against CK. AT & T directs this Court to no authority in support of this proposition, and we have found none. *The fact remains that AT & T made no claim against CK to which it could respond until AT & T actually named CK as a defendant.* In the hypothetical scenario described by AT & T, CK would not be liable for prejudgment interest. Only Qwest and C & S would be liable. We hold that AT & T did not give the required notice of its claim to CK until May 5, 2000, when AT & T amended its

---

**67.** *See Johnson & Higgins,* 962 S.W.2d at 528.

**68.** *See id.* at 530.

**69.** *Miga v. Jensen,* 25 S.W.3d 370, 381 (Tex. App.-Fort Worth 2000), *aff'd in part and rev'd in part,* 96 S.W.3d 207 (Tex.2002).

**70.** *See Johnson & Higgins,* 962 S.W.2d at 531.

**71.** TEX. FIN.CODE ANN. § 304.104 (Vernon Supp.2004); *Johnson & Higgins,* 962 S.W.2d at 531 (adopting these statutory dates for determination of prejudgment interest under common law).

petition to name CK as a defendant. *Only then was CK required to consider whether it should settle with AT & T.*[72] Thus, the Austin court held that the correct accrual date for prejudgment interest assessed against a defendant was dependent upon when that defendant got notice of the lawsuit.[73] We hold that the purposes of prejudgment interest would not be served by awarding prejudgment interest against CNB and Lawson from the date the suit against Bed & Bath was filed. The trial court therefore abused its discretion in using October 11, 1999, as the accrual date for prejudgment interest assessed against CNB and Lawson. We further hold that on remand, the prejudgment interest assessed against these two defendants is to be computed from the accrual date of June 9, 2000, the date that Appellees filed suit against them. We sustain CNB's fourth issue and Lawson's fifteenth issue.

### D. The Jury Charge

#### 1. ARI's Fraud Defense

In CNB's fifth issue, it contends that the trial court abused its discretion by submitting a jury question on the affirmative defense of fraud when Appellees never pled that defense, or any other matter of

avoidance, and offered no controverting evidence on the value of the deficiency.

 We review a jury charge under an abuse of discretion standard.[74] An abuse of discretion occurs only when the trial court acts without reference to any guiding principles.[75] The guiding principle for the submission of issues to the jury is that litigants are entitled to have controlling issues submitted to the jury if they are properly pled and supported by some evidence.[76] Generally, then, an affirmative defense must be pled.[77] The purpose of pleading is to give the adversary parties notice of each party's claims and defenses as well as notice of the relief sought.[78] Pleading the actual legal term is not required, so long as notice is given.[79]

In their live petition, Appellees contended,

> [D]espite the fact that [CNB] switched [Appellees] into a relationship with Bed & Bath, and despite the fact that Bed & Bath did not perform as represented by the bank and its officers, [CNB] foreclosed on the project.... This foreclosure was based upon the above-referenced loan that was procured and induced by the acts and omissions of [CNB].

---

72. *Qwest Communications Int'l, Inc. v. AT & T Corp.,* 114 S.W.3d 15, 39–40 (Tex.App.-Austin 2003, pet. filed) (emphasis added).

73. *Id.; see also Thrift v. Hubbard,* 44 F.3d 348, 362 (5th Cir.1995) (holding that prejudgment interest accrued on emotional distress claim from time complaint was amended to assert it); *but see Brownsville Pediatric Ass'n v. Reyes,* 68 S.W.3d 184 (Tex.App.-Corpus Christi 2002, no pet.) (holding that prejudgment interest against defendant added after suit was filed should be computed from the date the original suit was filed).

74. *Tex. Dep't. of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990).

75. *Id.*

76. *See* Tex.R. Civ. P. 278; *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex. 1995).

77. *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991); Tex R. Civ. P. 94.

78. *Perez v. Briercroft Serv. Corp.,* 809 S.W.2d 216, 218 (Tex.1991).

79. *See Earth Sci., Co. v. Lindley Int'l, Inc.,* 650 S.W.2d 217, 218 (Tex.App.-San Antonio 1983, no writ) (ratification adequately pleaded where plaintiff alleged necessary elements despite not specifically using legal term of ratification).

Appellees also raised fraud and fraudulent inducement:

> [CNB] made one or more material misrepresentations to [Appellees]. The misrepresentations include, but are not limited to, false statements of fact, promises of future performance made with an intent not to perform as promised, statements of opinion based on a false statement of fact, statements of opinion that [CNB] knew to be false, or expressions of an opinion that were false. The misrepresentations made by [CNB] were made with knowledge of [their] falsity or made recklessly without any knowledge of the truth and as a positive assertion and made with the intention that [Appellees] act in reliance upon them. [Appellees] sustained damages more fully set forth below by acting in reliance upon the misrepresentations made by [CNB].

Under the "Actual Damages" heading, Appellees included "benefit of the bargain" damages, specifically "amounts advanced on the loan for the Bed & Bath project and interest on the amounts advanced."

CNB counterclaimed for the deficiency between the balance of the note before the foreclosure and after the foreclosure, stating that ARI was liable as the principal obligor, and the principals were liable as a result of their status as guarantors. CNB also sought attorney's fees for prosecuting and appealing the claim. Over CNB's objection, the trial court submitted a question to the jury asking whether Appellees' failure to comply with the terms of the note was excused by CNB's fraud.

■ In our view, Appellees' petition raises fraud as both a cause of action for actual damages and an affirmative defense for damages they would be obligated to pay as benefit-of-the-bargain damages but for CNB's fraud. We hold that Appellees' allegations of facts constituting fraud, their raising of fraud and fraudulent inducement as claims, and their including the amount sought by CNB in the damages requested all demonstrated Appellees' contention that their default on the note should be excused (that is, they should not have to pay the deficiency) because of CNB's fraud. Thus, Appellees' pleadings clearly raised fraud as an affirmative defense. The trial court did not abuse its discretion in submitting the question. We overrule CNB's fifth issue.

### 2. Lawson's Defenses

In his ninth issue, Lawson contends that the trial court abused its discretion in refusing to submit his requested statute of limitations, waiver, ratification, estoppel, intervening cause, and mitigation instructions and questions to the jury. Because we do not reach his negligence and negligent misrepresentation issues, we also do not reach the related defenses of statute of limitations and intervening cause. The disputed defenses before us, then, are waiver, ratification, estoppel, and mitigation.

■ An appellate brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.[80] An issue is sufficient if it directs the appellate court to the error about which complaint is made.[81] An appellate court is not required to search the appellate record, with no guidance from the briefing party, to determine if the record supports the party's argument.[82] Thus, an inadequately

**80.** Tex.R.App. P. 38.1(h).

**81.** *Tex. Mexican Ry. Co. v. Bouchet,* 963 S.W.2d 52, 54 (Tex.1998).

**82.** *Hall v. Stephenson,* 919 S.W.2d 454, 466–67 (Tex.App.-Fort Worth 1996, writ denied); *Happy Harbor Methodist Home, Inc. v. Cow-*

briefed issue may be waived on appeal.[83] In arguing this issue, Lawson cites to the entirety of Appellants' proposed jury charge and instructions, some fifty-two pages. It is not our duty to comb through the fifty-two pages to determine whether he actually raised questions and instructions on the defenses; it is his. Lawson has thus waived this issue for appeal. We overrule Lawson's ninth issue.

### E. The 300 Shares of Stock

In its sole issue on appeal, LAR contends that it is the rightful owner of the three hundred shares of ARI stock it purchased at the foreclosure sale because there is no evidence of unjust enrichment. It also argues that canceling the other 600 shares is the only appropriate remedy for Appellees' issuance of the shares to hinder, delay, or defraud CNB and that the trial court should have submitted a charge on canceling the shares.

At trial, Appellees asked that the foreclosure sale at which LAR acquired the three hundred shares be nullified and that the shares be returned to them. This issue was submitted to the jury based on Appellees' cause of action for unjust enrichment:

### QUESTION 9

Did [LAR] obtain the 300 shares of stock in [ARI] by fraud, duress or the taking of undue advantage?

The jury answered "yes" to Question 9 and later answered "yes" to Question 14, inquiring whether the shares should be returned to the three principals. Judgment was entered ordering LAR to return the shares to ARI's principals.

LAR challenges the jury's finding on Question 9, arguing that no evidence was presented at trial that LAR had acted improperly in foreclosing on ARI's stock. After our review of the record, disregarding all evidence and inferences to the contrary, we hold that more than a scintilla of evidence exists to support the jury's finding in Question No. 9.

On July 14, 2000, Appellees were notified that the original three hundred shares of ARI stock pledged as collateral would be sold at foreclosure on July 31, 2000. Ruth Taylor immediately thought CNB's foreclosure was nothing more than a ruse to take majority control of ARI and dismiss ARI's pending lawsuit against CNB. CNB paid the $1,000 initial capital to form LAR, which was formed three days before the public sale of ARI's assets. Doug Sanders was named an officer of LAR. Richard Barajas, a CNB officer who had been on the loan committee that approved ARI's loan, was named president of LAR. Barajas had never known CNB to create such a "side company." Barajas also admitted that LAR was never a separate company, was formed to look after CNB's interests, and was always under CNB's control. Furthermore, Barajas admitted that LAR failed to comply with several provisions of the notice of foreclosure and that this was a misrepresentation to Appellees. The jury found that LAR obtained the three hundred ARI shares by fraud, duress, or the taking of undue advantage. We hold that sufficient evidence exists to support the jury's finding in Question 9.[84] Because we have held that

*ins*, 903 S.W.2d 884, 886 (Tex.App.-Houston [1st Dist.] 1995, no writ).

83. *Hall*, 919 S.W.2d at 467; *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex.1994) (discussing "long-

standing rule" that point may be waived due to inadequate briefing).

84. *See Bradford*, 48 S.W.3d at 754; *Cazarez*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118.

the jury properly awarded the three hundred shares to ARI, we do not reach LAR's subissues regarding the six hundred additional shares.[85] We overrule LAR's sole issue.

### III. CONCLUSION

We reverse the part of the trial court's judgment against (CNB) that awards (ARI) damages for DTPA violations, damages for loss of credit reputation, and trial and appellate attorney's fees. We reverse the part of the trial court's judgment against Don Lawson that awards ARI damages for loss of credit reputation.

We render judgment that ARI is entitled to recover $160,520.69 in actual damages on its fraud claim, which is the jury verdict of $172,602.89 for ARI's actual damages less 7%, or $12,082.20, that the jury attributed to ARI's own fault in causing the damages; plus prejudgment interest. Of the $160,520.69 and prejudgment interest,

a. CNB is liable for $82,849.39 plus prejudgment interest, based on the jury finding that CNB bears a 48% share of responsibility for ARI's actual damages;

b. CNB and Bed & Bath are jointly and severally liable for $51,780.87 plus prejudgment interest, based on the jury findings that Bed & Bath bears a 30% share of responsibility for ARI's actual damages and that CNB and Bed & Bath engaged in a conspiracy; and

c. CNB and Don Lawson are jointly and severally liable for $25,890.43 plus prejudgment interest, based on the jury finding that Don Lawson bears a 15% share of responsibility for ARI's actual damages and the

directed verdict that CNB is vicariously liable for Lawson's acts.

We also render judgment that ARI is entitled to recover exemplary damages of $317,000 from CNB and exemplary damages of $65,000 from Don Lawson.

We affirm the remainder of the trial court's judgment, excluding the amount of prejudgment interest attributable to CNB and Lawson. We reverse and remand the case to the trial court for recalculation of prejudgment interest attributable to CNB and Lawson and for entry of judgment in accordance with this opinion.

CAYCE, C.J., concurs in result only.