COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO. 2-04-275-CV

 

 

MAIN PLACE CUSTOM HOMES, INC.                                    APPELLANTS

AND RON SMITH

 

                                                   V.

 

RICHARD HONAKER AND                                                      APPELLEES

GINGER HONAKER

                                              ------------

 

            FROM THE 393RD
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

Introduction








This
case involves a homeowners= suit against a builder and its
owner in connection with a slope failure and related soil movement that
occurred on the homeowners= property, damaging their property
and home.  In ten issues,[1]
appellants contend that the trial court=s failure to make additional
requested findings of fact and conclusions of law prevents them from properly
presenting their case to this court; that the evidence is legally and factually
insufficient to support certain of the trial court=s findings; that the trial court abused its discretion by
ordering appellants to turn over A[t]he insurance policy,
declarations, and all documents related [to] Great American Lloyds policy
PAC-982-01-64-01@ and A[a]ll insurance claims or causes of action of [appellants]
pursuant to [that] policyA; that the trial court=s award of prejudgment interest should be vacated; and
that the mental anguish damages award should be reversed because it is not
segregated between the appellees, Richard and Ginger Honaker.  We modify the judgment in part and affirm it
as modified.

Background
Facts

In
1997, appellant Main Place Custom Homes, Inc. bought a lot in the Stonebriar
subdivision of Frisco.  Main Place was
owned by appellant Ron Smith and his ex-wife Maxine Smith.  Main Place built a custom luxury home on the
property.[2]  It was the first Amillion dollar@ home that Main Place had built.








Appellees
Richard and Ginger Honaker first saw the home in 1998 while it was under
construction.  They were impressed with
the view from the back of the home, from which a steep embankment overlooks a
creek and golf course.[3]  Richard was concerned about the steep slope
of the embankment and asked Smith whether the home would slide off the
hill.  Smith told Richard that the Ahouse and lot [are] as solid as they come,@ that Ahe built homes on solid lots,@ that the property Awas stable and . . . there would
be no problems with the house or property falling away,@ and that Smith was Aused to building solid homes that
did well.@ 
Smith made these representations before, during, and after the Honakers
contracted to purchase the home. 
Richard testified that he relied on these statements in purchasing the
property.  








The
Honakers signed an agreement to buy the property on February 15, 1998.  They included a provision in the contract
requiring Main Place to provide them with engineering reports about the
retaining wall on the south end of the property and on the foundation.  Smith provided them with two letters,[4]
both of which opined that the retaining wall was strong enough to withstand the
pressure of the built-up foundation. 
Neither letter mentioned any problems with the soil on which the home
was built.  After receiving the letters,
Richard asked Smith if any further reports were necessary about Athe grading and the stability of the land and the home.@  Smith told
Honaker that no further reports were necessary.

The
Honakers closed on the property on November 23, 1998.  In August 2000, the soil on the south side of the foundation
began cracking and pulling away from the back porch.  Smith came to the house at Richard=s request to look at the
cracking.  Smith told Richard that the
problem was Anormal settling@ and to fill the area with sand.  He also told Richard that the cracking was not a problem.








On
November 6, 2000, the slope behind the home failed and caused a major
landslide.  Smith came out to look at
the damage and told Richard that the slope failure would not damage the home.  Over the next several months, however, the
property sustained damage related to the slope failure, such as cracking in the
pool, cracking in the drywall, damage to the retaining wall, a shattered
picture window, cracked tile, heaving of the foundation, and further movement
in the soil.  The Honakers had to hire
engineers to investigate the problems. 
They were also forced to pay damages to their homeowners= association because the contractor they hired to fix the
retaining wall encroached on the homeowners= association=s easement. 
Richard testified that the damage to the home was so greatCand was continuing at such a rateCthat there was a stigma attached to the home that
prevented the Honakers from selling it, except for much less than the property
was worth.

The
Honakers eventually discovered that the home=s sprinkler system had been
improperly connected to the city water hookups, causing thousands of gallons of
water to leak under the home.  The
engineering reports they obtained advised that this water leakage would not
have been a problem but for the soil that the home was built on.  The home was built at the joining of two
different types of soil:  one being
stable and the other being very unstable. 
The joining of the two, combined with the excessive amount of water,
caused movement in the soil that the home was built on.








Several
months after discovering the sprinkler leak, the Honakers filed suit against
appellants; Stonebriar Residential Joint Venture, Hillwood/Stonebriar
Residential, Ltd., and Hillwood Property Company f/k/a Hillwood Clubs, Inc.,
the initial developers of the property (collectively referred to as the
developer); Larry Smith, L.F.S. Construction, Inc., and L.F.S. Systems, Ltd.,
and Larry F. Smith, Inc., the contractor whom Richard hired after the slope
failure to repair the retaining wall; Marc Wilson d/b/a Texas Green, the
subcontractor who installed the sprinkler system; and Chubb Lloyds Insurance
Company of Texas, the Honakers= homeowners= insurance company. 
The Honakers settled their claims against all parties except appellants,
and the trial court dismissed the claims against those parties with
prejudice.  Thus, the Honakers proceeded
to trial on their DTPA, fraud in a real estate transaction, breach of warranty,
negligent misrepresentation, and negligence claims against Main Place, and
DTPA, fraud in a real estate transaction, negligent misrepresentation, and
negligence claims against Smith.








After
a bench trial, the trial court found in favor of the Honakers and signed a
judgment awarding them approximately $800,000. 
In addition to awarding the Honakers damages, prejudgment interest, and
attorney=s fees for both the trial and any
appeals, the judgment ordered appellants to deliver to the Honakers A[t]he insurance policy, declarations, and all documents
related [to] Great American Lloyds policy PAC-982-01-64-01@ and A[a]ll insurance claims or causes
of action of [appellants] pursuant to Great American Lloyds policy
PAC-982-01-64-01.@ 
It further ordered that the Honakers Ashall be assigned to and have the
right to pursue action against Great American Lloyds policy PAC-982-01-64-01 as
a third party beneficiary and assignee of [appellants].@       Appellants filed a request for findings of
fact and conclusions of law.  On July
22, 2004, the trial court filed findings of fact and conclusions of law, and
appellants responded by requesting additional findings of fact and conclusions
of law.  The trial court signed an
amended final judgment on September 7, 2004, reducing the damages originally
awarded by $30,000, the amount of a settlement credit for the settlements with
the developer and Marc Wilson. 
Appellants then filed a further additional request for findings of fact
and conclusions of law based on the amended final judgment.  The trial court signed amended findings of
fact and conclusions of law on October 4, 2004 and March 15, 2005.  Those amended findings include some, but not
all, of the additional findings requested by appellants.

Findings
of Fact and Conclusions of Law

In
their first issue, appellants contend that the trial court erred by failing to
make all of the additional findings of fact and conclusions of law that they
requested based on the amended final judgment because the trial court=s failure to do so prevents them from adequately
presenting their appeal.  Specifically,
appellants complain about the trial court=s failure to quantify the amount
of damages caused by each appellant under each theory of liability.  








A
trial court is required to file findings of fact and conclusions of law within
twenty days after a timely request is made. 
See Tex. R. Civ. P.
297.  Upon a party=s timely request for additional findings, the trial court Ashall file any additional or amended findings and
conclusions that are appropriate.@ 
Tex. R. Civ. P. 298.  Additional findings are not required if the
original findings and conclusions Aproperly and succinctly relate the
ultimate findings of fact and law necessary to apprise [the party] of adequate
information for the preparation of [the party=s] appeal.@  Balderama v.
W. Cas. Life Ins. Co., 794 S.W.2d 84, 89 (Tex. App.CSan Antonio 1990), rev'd on other grounds, 825
S.W.2d 432 (Tex. 1991); see Jamestown Partners, L.P. v. City of Fort Worth,
83 S.W.3d 376, 386 (Tex. App.CFort Worth 2002, pet. denied);
In re Marriage of Morris, 12 S.W.3d 877, 886 (Tex. App.CTexarkana 2000, no pet.); Finch v. Finch, 825
S.W.2d 218, 221 (Tex. App.CHouston [1st Dist.] 1992, no
writ).  An ultimate fact is one that
would have a direct effect on the judgment. 
Morris, 12 S.W.3d at 886. 
If the refusal to file additional findings does not prevent a party from
adequately presenting an argument on appeal, there is no reversible error.  Jamestown Partners, 83 S.W.3d at 386;
Johnston v. McKinney Am., Inc., 9 S.W.3d 271, 277 (Tex. App.CHouston [14th Dist.] 1999, pet. denied).  If the requested findings will not result in
a different judgment, the findings need not be made.  Johnston, 9 S.W.3d at 277. 








Here,
the Honakers contend that Aif the findings of fact in the
case at bar are sufficient to uphold the judgment under any of the
causes of action pled by Honaker, a different judgment does not result.@  Appellees brought
five causes of action against Main Place and four causes of action against
Smith.  In the second amended findings
and conclusions, the trial court found and concluded that Smith and Main Place
violated the DTPACwhich included a finding that Main
Place breached the implied warranty of good and workmanlike constructionCand made negligent misrepresentations in connection with
the sale of the home, that Smith was liable for fraud in a real estate
transaction, and that Main Place breached its contract with the Honakers and
was negligent in designing, constructing, warranting, and repairing the
home.  In its conclusions in the Second
Amended Findings of Fact and Conclusions of Law, the trial court did not assign
damage findings to each cause of action; instead, the trial court concluded as
follows:

23.1  [The Honakers] proved reasonable and necessary
cost of repair damages in the amount of $221,585.06.

23.2  [The Honakers] proved permanent reduction in
market value after repairs are made in the amount of $300,000.00.

23.3  [The Honakers] proved special damages in the
amount of $12,533.05 [the amount they paid to the homeowners= association for encroachment on the easement].

23.4  [The Honakers] proved out of pocket expenses
in the amount of $5,229.93.








23.5  [The Honakers] proved mental anguish damages
in the amount of $50,000.00.

23.6  [The Honakers], having prevailed on several
causes of action, are entitled to costs of court.

The trial
court further concluded that the Honakers, Ahaving prevailed on their DTPA and
Breach of Contract causes of action, are entitled to attorney=s fees@ of $237,736.45, plus $15,000 for
an appeal to the court of appeals and $10,000 for an appeal to the supreme
court. 

If
a plaintiff pleads multiple theories of recovery for a single injury and does
not elect its remedies before the trial court proceeds to judgment, the trial
court should render the judgment offering the greatest recovery.  Birchfield v. Texarkana Mem=l Hosp., 747 S.W.2d 361, 367 (Tex. 1987).  If the trial court does not do so, the
appellate court must use the findings awarding the greatest theory of recovery
and render judgment accordingly. 
Citizens Nat=l Bank v. Allen Rae Investments,
Inc., 142 S.W.3d
459, 475 (Tex. App.CFort Worth 2004, no pet.) (op. on
reh=g).  








Here,
the DTPA allows the greatest recovery. 
The trial court awarded economic damages, mental anguish damages, and
attorney=s fees.  All three are recoverable under the DTPA.  See Tex.
Bus. & Com. Code Ann. ' 17.50(d) (Vernon Supp.
2005).  Mental anguish damages are not
recoverable for breach of contract, Latham v. Castillo, 972 S.W.2d 66,
72 (Tex. 1998), and attorney=s fees are not recoverable for the
Honakers= fraud in a real estate transaction,
negligence, and negligent misrepresentation claims, see Tex. Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon 1997). 
And the Honakers could not recover attorney=s fees from Smith under any theory other than DTPA because
he was not a party to the contract for the sale of the home.  See id.[5]  Appellants have fully briefed their
complaints on appeal with respect to the Honakers= DTPA claims.[6]  Consequently, if the trial court=s judgment can be upheld under the DTPA, no additional
findings are necessary.  See Citizens
Nat=l Bank, 142 S.W.3d at 475; Jamestown
Partners, 83 S.W.3d at 386.  We will
therefore first address appellants= issues challenging the
sufficiency of the evidence to support the Honakers= recovery under the DTPA before disposing of appellants= first issue.

Legal
and Factual Sufficiency








In
appellants= second through fifth issues, they
claim that the evidence is legally and factually insufficient to support the
trial court=s findings and conclusions on the
percentage of responsibility apportioned among appellants and the settling
defendants, the attorney=s fees award, DTPA Alaundry list@ violations, and the Aknowing@ element of the DTPA
violations.  

Standard of Review

Findings of fact entered in a case tried to the court have
the same force and dignity as a jury=s answers to jury questions.  Anderson v. City of Seven Points, 806
S.W.2d 791, 794 (Tex. 1991).  The trial
court=s findings of fact are reviewable
for legal and factual sufficiency of the evidence to support them by the same
standards that are applied in reviewing evidence supporting a jury's
answer.  Ortiz v. Jones, 917
S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).








A
legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence
of evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999); Robert W. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 TEX. L. REV.
361, 362-63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). 

Anything
more than a scintilla of evidence is legally sufficient to support the
finding.  Cont=l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch
v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  When the evidence offered to prove a vital fact is so weak as to
do no more than create a mere surmise or suspicion of its existence, the
evidence is no more than a scintilla and, in legal effect, is no evidence.  Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983).  More than a
scintilla of evidence exists if the evidence furnishes some reasonable basis
for differing conclusions by reasonable minds about the existence of a vital
fact.  Rocor Int=l, Inc. v. Nat=l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).








Any
ultimate fact may be proved by circumstantial evidence.  Russell v. Russell, 865 S.W.2d 929,
933 (Tex. 1993).  A fact is established
by circumstantial evidence when the fact may be fairly and reasonably inferred
from other facts proved in the case.  Id.  However, to withstand a legal sufficiency
challenge, circumstantial evidence still must consist of more than a
scintilla.  Blount v. Bordens, Inc.,
910 S.W.2d 931, 933 (Tex. 1995).

An
assertion that the evidence is factually insufficient to support a fact finding
means that the evidence supporting the finding is so weak or the evidence to
the contrary is so overwhelming that the answer should be set aside and a new
trial ordered.  Garza v. Alviar,
395 S.W.2d 821, 823 (Tex. 1965).  We are
required to consider all of the evidence in the case in making this
determination, not just the evidence that supports the finding.  Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406-07 (Tex.), cert. denied, 525 U.S. 1017 (1998).  When conducting a factual sufficiency
review, a court of appeals must not merely substitute its judgment for that of
the trier of fact.  Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  The trier of fact is the sole judge of the
credibility of witnesses and the weight to be given to their testimony.  Id.








Unchallenged
findings of fact are binding unless the contrary is established as a matter of
law or there is no evidence to support the findings.  McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986); Reliance
Ins. Co. v. Denton Cent. Appraisal Dist., 999 S.W.2d 626, 629 (Tex. App.CFort Worth 1999, no pet.). 
Conclusions of law may not be challenged for factual sufficiency, but
they may be reviewed to determine their correctness based upon the facts.  Dominey v. Unknown Heirs & Legal
Representatives of Lokomski, 172 S.W.3d 67, 71 (Tex. App.CFort Worth 2005, no pet.); Rogers v. City of Fort
Worth, 89 S.W.3d 265, 277 (Tex. App.CFort Worth 2002, no pet.).

Proportionate
Responsibility Findings








In
their second issue, appellants contend that to the extent the trial court=s basis for recovery under the judgment is based on the
DTPA, the evidence is legally and factually insufficient to support finding of
fact 17.1.[7]  In finding of fact 17.1, the trial court set
forth the percentage of responsibility for each party that caused the Honakers= damages:  Main
Place 60%, Smith 20%, Wilson 20%, and the Honakers and the developer 0%.  According to appellants, A[t]he overwhelming weight of the evidence is that Texas
Green=s improper installation of the
sprinkler system caused the Sprinkler Leak, which . . . was the >primary cause= of the slope failure and the
damages sought@ by the Honakers.  They claim that the evidence shows that the
development of the lot before Main Place purchased it was the secondary cause
of the slope failure and that Smith relied on subcontractors to design the
foundation when developing the lot and on their expertise in determining the
appropriate building standards to do so. 
According to appellants, Athe sole testimony is that Texas
Green or the developer caused the damages.@

To
prevail on a DTPA cause of action, a plaintiff must prove that the defendant=s misrepresentations were the producing cause of the
plaintiff=s injuries.  Tex.
Bus. & Com. Code Ann. ' 17.50(a); Alexander v. Turtur
& Assocs., Inc., 146 S.W.3d 113, 117 (Tex. 2004).  Producing cause requires that the acts be
both a cause‑in‑fact and a Asubstantial factor@ in causing the injuries. 
Brown v. Bank of Galveston, Nat=l Ass=n, 963 S.W.2d 511, 514 (Tex. 1998); Union Pump Co. v. Allbritton,
898 S.W.2d 773, 775 (Tex. 1995).  A
producing cause is an efficient, exciting, or contributing cause, which in the
natural sequence of events, produces injuries or damages.  Brown, 963 S.W.2d at 514; Haynes
& Boone v. Bowser Bouldin, Ltd., 896 S.W.2d 179, 182 (Tex. 1995).  There may be more than one producing
cause.  Haynes & Boone, 896
S.W.2d at 182.  








Here,
Richard testified about the discovery of the sprinkler leak.  According to Richard, when he told Smith
that tile was cracking in the northwest bedroom of the house,[8]
Smith told him to have a plumber investigate. 
Richard hired Randy Hite, who found a Apressure problem,@ consisting of a leak where the sprinkler system connected
to the city water valve.  Richard said
that that part of the work (the sprinkler hookup) had been done by Main Place
or its subcontractors in constructing the home.  Apparently, two gallons of water per hour had leaked underground
from November 1998 to July or August 2001. 








On
Smith=s recommendation, Richard hired
Larry Smith (no relation to Smith) to repair the retaining wall, which had also
begun cracking.  Larry told Richard that
there were several reasons for the slope failure.  He said Athe land was not scarified nor
terraced appropriately, with improper fill[,] and a slip plane had been
produced as opposed to a stable fill.@ 
According to Larry, this analysis comported with two engineering reports
Richard had procured regarding the property (the Reed and Nelson reports).[9]  Larry told Richard that that analysis was
also consistent with the leaking sprinkler connection.  Larry also told Richard that the embankment
behind the house was a greater than 3 to 1 slope,[10]
and that the slope should be no greater than 3 to 1 according to industry
standards.  Larry said that vegetation,
building materials, and limestone from the front of the lot had been pushed to
the back of the lot during construction and that was part of the problem.  Richard testified that Larry told him the
problem was the fault of a combination of the developer and the builder, Main
Place.  Richard understood that Larry
thought there was a connection between the sprinkler leak and the slope failure
and heaving on the west side of the home. 
Richard believed Smith provided the fill dirt on the property. 

When
Richard discussed the problems with Smith, Smith told him that he thought he
had bought a good lot that was properly stabilized.  Richard testified that he thought appellants should have done
more detailed engineering to determine the stability of the home.  








Whitney
Smith, a geotechnical engineer and Vice President of Reed Engineering Group,
testified that the home is located on the Austin Chalk Limestone formation on
the northeastern side and on the Eagle Ford Shale formation on the southwestern
side.  The two formations meet in a Atransition area@ on the Honakers= property.  The
lower elevations of the property are mostly Eagle Ford Shale, and the higher
elevations are mostly Austin Chalk Limestone overlapping Eagle Ford Shale.  Thus, the eastern part of the property is
more stable than the western part. 
According to Whitney, A[t]he vast majority of the
landslides and slope failures that [he had] studied in the Dallas/Ft. Worth
area have been in the Eagle Ford Shale formation.@ 
Whitney testified that before the Honakers= property was developed, the slope
was fairly flat, but at some point, fill was put in to raise the back of the
lot to level with the front, and a retaining wall was added to restrain the
fill.  Through Whitney, the Honakers
introduced into evidence geotechnical engineering reports from Rone Engineers
that had been prepared for the developer. 
The developer gave these reports to Smith when Main Place first bought
the property.  Smith did not provide
these reports to the Honakers in response to their request for engineering
reports about the stability of the property, instead giving them reports from
two other engineering firms, opining that the property was stable and the
retaining wall was adequate.








Whitney
testified that the Rone report contained information that would raise questions
about the stability of the lot and that most engineers familiar with the Eagle
Ford Shale formation would have concerns after reading the report about slope
stability and movement of the Eagle Ford Shale formation.  According to Whitney, there was not enough
information in the Rone report to properly design a slope on that lot.  He would have requested extra soil
borings.  

The
foundation of the home contains piers. 
According to Whitney, the Rone report does not contain design criteria
for the type of foundation that is under the home.  Also, the additional borings report provided to Smith by the
developer states, AOur findings indicate that the
proposed residential buildings could be adequately supported on a stiffened slab-on-grade
type foundation.  The slab may be either
grid-type grade beam and slab or post-tensioned slab foundation system.@  [Emphasis
added.]  Whitney additionally testified
that the Rone report recommended that the site grading plans for construction
strive to achieve positive drainage around all sides of the proposed residence,
but that when he visited the site, Athere [were] some areas that
appeared there was not positive drainage.@ 
Further, the Nelson report, one of the engineering reports that Richard
obtained after the slope failure, indicates that there was not positive
drainage around the whole house. 
Whitney testified that he agreed with the Rone report that Ainadequate drainage can cause excessive vertical
differential movements to occur.@ 
He explained that this means that Aif you allow water to pond
adjacent to the residence, it can begin to be absorbed by the expansive clays
beneath the foundation.  When the clays
absorb water, they swell and expand and tend to push up on the foundation.@ 








Whitney
testified that the slope on the back of the property was significantly steeper
than recommended by the Rone report. 
The Rone report recommended a maximum 3 to 1 slope, but the slope on the
property was 2 to 1.  Whitney testified
that in the Eagle Ford Shale formation, stable slopes are between 4 to 1 and 6
to 1. 

Whitney
also testified that debris in the fill on the property violated the
recommendations in the Rone report, which recommended stripping the landscaping
to a minimum depth of 6 inches and scarifying for compaction purposes.  Whitney opined that settlement can occur if
a significant amount of organics were included in the fill and that that could
also affect slope stability.  Whitney
said he would have wanted many borings before building on such a site.  Here, most of the borings were taken toward
the street side rather than near the retaining wall where the fill was. 

Whitney
also testified that the south and west part of the home=s foundation was elevated with respect to the north and
east part, which showed very little movement. 
South and west was the direction of the slope failure as well as the
direction of the overlap of the two formations. 








According
to Whitney, Athe ground water that accumulated
in the back of the property was the primary cause of the land sliding@ and was attributable to the sprinkler leak.  The leak was in the northwest corner of the
property underground in the colluvial layer, which is more permeable than the
layers above or below it.  It runs
downhill along the less permeable underlayer. 
This water was not attributable to rainfall or other sources.  Because of the poor drainage around the
property, the ground water was being taken in as storage.  The leak was significant to the ground water
table. 

Whitney
testified that a secondary cause of the slope failure was the lack of A[s]pecific investigation of global stability@ of the retaining wall before it was designed or after it
was designed and before the house was built. 

Randy
Hite, the plumber who discovered the sprinkler leak, testified about his
discovery.  He testified that
overtightening of the connection between the home sprinkler system and the city
water system happens frequently and that a soldered fitting, rather than the
PVC pipe that was used, would have been more adequate for the system that was
installed. 








Smith
testified that the first time he saw the site it had already been filled and
the retaining walls were up.  He never
inspected the fill dirt personally, but he obtained density tests from the
developer and gave them to Parrent Engineering, the engineer Main Place used to
design the home=s foundation.   The Rone report is one of the density
reports the developer gave Main Place. 
Appellants introduced into evidence the results of an additional boring
test Smith requested when Main Place bought the lot from the developer.  The developer did not give Smith any other
tests when Main Place bought the lot. 
Smith agreed that Parrent could have done additional testing on the
property, but it did not.  Smith agreed
that the retaining wall was necessary to the stability of the slope and
important to the integrity of the property. 

Smith
testified that Main Place made all the decisions about which subcontractors to
hire in building the home.  As builder
of the Aspec@ home, Main Place had control over
all of the design and building decisions. 








When
Main Place bought the property from the developer, the contract expressly
disclaimed any warranty regarding the fill dirt,[11]
but Smith didn=t do any further investigations
and didn=t think he needed to because
Parrent told him he didn=t.  Smith testified that he and Parrent relied entirely on the Rone
report and the additional borings report. 
He told Parrent it had to rely on the Rone report for the design of the
home=s foundation.  Smith said that if Parrent had needed more
information than what was in those reports, it would have asked him, and he
would have told it to get what it needed. 
Smith testified that he has no training in reading soil reports and
hires others to do the work for him. 
Here, he relied on Parrent.[12]

Smith
said that when he looked at the site, he saw a lot of ground movement, but no
foundation movement.  Smith did not
verify the grading recommendations in the Rone report.  He did not review the borings report and the
Rone report, and he did not understand the information in them, which is why he
gave them to Parrent to review and make recommendations.  As to the retaining wall, he said anything
over four feet has to be engineered to hold up dirt and that he knew the wall
would withstand the dirt because AMetroplex Retaining Wall built it.@  Smith did not
obtain Metroplex=s engineering data for the wall. 








Richard
and Ginger both testified about the representations Smith made before and after
they bought the property.  Richard
testified that when he asked Smith if the home would fall off the hill, Smith
said, AThat shouldn=t be a problem. 
This house and lot [are] as solid as they come.@  When Richard
asked Smith if the retaining wall was strong enough to do its job on such a big
embankment, Smith told him that the wall was properly installed.  Smith told the Honakers that Ahe was used to building solid homes that did well,@ took them to another home he built, and Abasically showed [them] and told [them] that he built
solid homes on solid lots.@ 
When Richard first noticed the lawn pulling away from the back porch,
Smith told him that he didn=t think it was a problem, to keep
an eye on it, and to call him if it got worse. 

Ginger
testified that Smith assured them the home was stable and that the home or
property would not fall away.  She said
they relied on the engineering reports Smith gave them in buying the
property.  She testified that they were
reassured by the reports and didn=t know where to get their
own.  

Considering
the entire record, as we must, the evidence shows that there were several
different causes of damage to the property, which included not just the slope
failure, but also, among other things, heaving in the foundation, failure of
the retaining wall, and cracking in the drywall and tile.  Specifically, the evidence shows that these
damages were caused by the sprinkler leak, poor drainage in the soil around the
home, the inclusion of improper fill in the back of the property, improper
grading and compaction of the back part of the property, a slope that was
steeper than recommended for the soil, and a foundation that was not properly
designed for the soil upon which it was built. 
Thus, the evidence shows multiple problems, all of which ultimately
hinge upon the original design and placement of the home on inherently unstable
soil.








In
addition, the Honakers= DTPA claims are based on the
causal connection between Smith=s misrepresentations and their
damages.  Here, both of the Honakers
testified that they relied on Smith=s statements about the stability
of the property and on the letters he provided them opining that the home=s foundation and the retaining wall were stable.  Richard testified that he would not have
purchased the property without the engineering reports.[13]  This evidence supports the conclusion that
but for appellants= misrepresentations, the Honakers
would not have incurred damages in connection with the property.  See Kessler v. Fanning, 953 S.W.2d
515, 519 (Tex. App.CFort Worth 1997, no pet.).  Thus, we hold that the evidence supports the
percentages of proportionate responsibility in finding of fact 17.1.  We overrule appellants= second issue.

Attorney=s Fees Award

In their third issue, appellants claim that the trial
court=s award of attorney=s fees is not supported by the evidence and that the trial
court erred by not segregating fees among the original defendants.  








Section
17.50(d) of the Texas Business and Commerce Code provides that a party who
recovers on a DTPA claim Ashall@ recover its reasonable and necessary attorney=s fees.  See
Tex. Bus. & Com. Code Ann. ' 17.50(d).  In
determining the reasonableness and necessity of attorney=s fees, courts should consider the eight factors recited
in rule 1.04 of the rules of professional conduct. Tex. Disciplinary R. Prof'l Conduct 1.04(b), reprinted in
Tex. Gov=t Code
Ann., tit. 2, subtit.
G app. A (Vernon 2005) (Tex. State Bar
R. art. X, ' 9); Arthur Andersen & Co.
v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997).  Those factors are (1) the time and labor
required, the novelty and difficulty of the questions involved, and the skill
required to perform the legal services properly; (2) the likelihood that the
acceptance of the particular employment will preclude other employment by the
lawyer; (3) the fee customarily charged in the locality for similar legal
services; (4) the amount involved and the results obtained; (5) the time
limitations imposed by the client or by the circumstances; (6) the nature and
length of the professional relationship with the client; (7) the experience, reputation,
and ability of the lawyer or lawyers performing the services; and (8) whether
the fee is fixed or contingent on results obtained or uncertainty of collection
before the legal services have been rendered. 
Andersen, 945 S.W.2d at 818.








The
Honakers= trial counsel, Mark McQuality,
testified concerning his firm=s fees.  He testified that this was one of the more difficult, challenging
cases he had tried and that he specializes in homeowners= cases.  He
testified that this was a very personal, emotional case and that the Honakers
needed more counseling than normal because of the emotional nature of the
case.  Also, they were new to
litigation.  McQuality further testified
that the case had been pending for almost two years during which his firm had
not been compensated for all of its work on the case.

The
Honakers introduced Exhibit 25 into evidence, which is a summary of the total
attorney=s fees incurred by their counsel,
plus all costs and expenses they incurred in connection with the
litigation.  Exhibit 25 shows that
McQuality=s firm spent 880.84 hours on the
case, for a total of $176,692.40 in fees.[14]  McQuality testified that he is familiar with
the fees charged in North Texas in these types of cases and that the fees were
reasonable.  








McQuality
further testified that attorney=s fees in this case could be
calculated either in accordance with the hybrid contingency fee agreement that
his firm entered into with the Honakers or in accordance with a Alode star@ calculation.  He testified that the Honakers paid his firm
$41,000 in retainer fees, which consisted of an initial retainer and smaller
monthly retainers for a certain number of months.[15]  His firm would then receive a 33%
contingency if the Honakers received any compensation before filing suit, 35%
if they received any compensation after filing suit, and 40% if they recovered
damages after the case went to trial. 
The $41,000 already paid by the Honakers would be credited to the
attorney=s fees recovery.  McQuality testified that total contingent
attorney=s fees in this case would be
$297,170.57.  He then estimated that 80%
of the total contingency feesCor $237,736.45Ccould be attributed to appellants.  The amended final judgment awards the
Honakers $237,736.45 in attorney=s fees.

Appellants
first contend that the evidence is insufficient to support an award of attorney=s fees pursuant to the hybrid contingency fee agreement
between the Honakers and their counsel.








In
Arthur Andersen, the supreme court concluded that evidence of a
contingency fee agreement alone cannot support an award of reasonable and
necessary attorney=s fees.  Id. at 818; VingCard A.S. v. Merrimac Hospitality Sys.,
Inc., 59 S.W.3d 847, 869 (Tex. App.CFort Worth 2001, pet. denied) (op.
on reh=g).  While a contingency fee contract should be considered by the
factfinder, the factfinder should also be guided by the other factors from rule
1.04(b).  Arthur Andersen, 945
S.W.2d at 818; VingCard, 59 S.W.3d at 869.  A party cannot simply ask to be awarded a percentage of the
recovery as a fee because without evidence of the factors identified in rule
1.04(b), the factfinder has no meaningful way to determine if the fees were in
fact reasonable and necessary.  Arthur
Andersen, 945 S.W.2d at 818‑19; VingCard, 59 S.W.3d at
869.  The court held that a party must
prove that the amount of fees was both reasonably incurred and necessary to the
prosecution of the case, and must ask for a specific dollar amount, not a percentage
of the judgment.  Arthur Andersen,
945 S.W.2d at 819; VingCard, 59 S.W.3d at 869.

Here,
McQuality testified as to the Arthur Andersen factors.  He also testified that the percentages
charged in the hybrid contingency fee agreement Aare usual and customary
percentages charged on those types of cases.@ 
McQuality further stated that Agiven the fact that [his firm had]
expended a considerable amount of time as reflected by Exhibit 25 that has not
been compensated, that that is a reasonable and necessary fee in this case.@  He asked for a
definite amount of 80% of $297,170.57. 
We hold that the evidence is legally and factually sufficient to show
that the Honakers= attorney=s fees of $237,736.45 were reasonable and necessary.








Appellants
next complain that the trial court erred by awarding attorney=s fees because the Honakers failed to allocate the amount
of attorney=s fees incurred with respect to
each of the ten original defendants.  

When a plaintiff seeks to recover
attorney=s fees in cases where there are
multiple defendants, and one or more of those defendants have made settlements,
the  plaintiff must segregate the fees
owed by the remaining defendants from those owed by the settling defendants so
that the remaining defendants are not charged fees for which they are not
responsible.  

 

Stewart
Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10-11 (Tex. 1991); Hartmann v. Solbrig, 12
S.W.3d 587, 594 (Tex. App.CSan Antonio 2000, pet.
denied).  Segregation is not required,
however, if the claims arise out of the same transaction and are so
interrelated that their prosecution or defense requires proof or denial of
essentially the same facts.  Sterling,
822 S.W.2d at 11; Hartmann, 12 S.W.3d at 594.  

When
McQuality was asked if he could apportion his fees among the defendants, he
said,

Yes,
I have. . . . My experience has been that -- these facts are typically so
intertwined that it is very difficult to apportion fees to one defendant versus
another.  But I have attempted to do
that and have calculated and looked at doing that.  And I believe that --because there is a lot of duplication
of work, whether it is one defendant or multiple defendants, I believe that at
least 80 to 85 plus percent of the work would be the same whether or not it was
just your clients or whether there were these other defendants as well. 

 








He
said he didn=t keep track of the time he spent
deposing each particular defendant, but that but for the efforts of the other
defendants= attorneys, appellants= defense counsel would have had to ask more questions and
spend more deposition time than he did. 
When asked if he kept track of how much time was spent on each defendant
as to the total case, he answered

I
don=t think there was any way to, and
I don=t think the case law requires us
to keep a clock of hours spent as to each defendant because of the intertwining
of the work.  I have testified as far as
my experience and thoughts on this case as far as the time spent totally, and
that would be determined against your client as opposed to the others. 

 

McQuality also
said that in settling with the other defendants, he looked at the amount of
attorney=s fees in the case and considered
that. 

Although
appellants construe McQuality=s testimony as Avaguely insinuating@ that the claims against all the
defendants were so interrelated that their prosecution or defense requires
proof or denial of essentially the same facts, McQuality unequivocally
testified that there was a lot of duplication of work and that 80 to 85% of the
work would be the same no matter what defendants remained in the suit.  Appellants did not present any controverting
evidence.  Thus, we conclude that the
evidence is legally and factually sufficient to support the award of attorney=s fees in the amount of 80% of the total contingency fee
amount proved by the Honakers.








Appellants
further contend that there is no evidence to support the trial court=s award of attorney=s fees in the event of an
appeal.  But the Honakers included a
request for such fees in their petition, and the trial court may take judicial
notice of such reasonable and necessary fees even if its judgment does not
state that it did so.  See Lefton v.
Griffith, 136 S.W.3d 271, 279 (Tex. App.CSan Antonio 2004, no pet.); Copeland
v. Alsobrook, 3 S.W.3d 598, 609 (Tex. App.CSan Antonio 1999, pet. denied).

Lastly,
appellants claim that the fees should be segregated between Smith and Main
Place.  But as we have stated above, the
evidence supports the conclusion that the claims against all the defendants,
including appellants, were so interrelated that their prosecution or defense
requires proof or denial of essentially the same facts.  In addition, the Honakers point out that in
his answer to their second amended petition, Smith asserted that he did not act
in his individual capacity, but rather as an employee of Main Place.  Thus, the evidence supporting DTPA liability
as to Main Place also supports DTPA liability as to Smith and involves the same
proof.  See Miller v. Keyser, 90
S.W.3d 712, 716 (Tex. 2002).

We
overrule appellants= third issue.

DTPA
violations








In
their fourth issue, appellants contend that the evidence is legally and
factually insufficient to support the trial court=s findings that appellants
violated the DTPA.  Specifically,
appellants contend that the evidence is insufficient to support a violation of
any of the Alaundry list@ violations set forth in subsections 5, 7, 12, 13, 20, and
24 of section 17.46 and that there is no evidence that appellants= conduct was a producing cause of the Honakers= damages.  Tex. Bus. & Com. Code Ann. '' 17.46(b)(5), (7), (12), (13), (20), (24) (Vernon  Supp. 2005).  As we have already addressed above in our disposition of
appellants= second issue, there is legally
and factually sufficient evidence to support the trial court=s finding that appellants= conduct was a producing cause of
the Honakers= damages.  Thus, we need only address here whether
there is sufficient evidence to show that appellants= conduct violated at least one of the Alaundry list@ violations found by the trial
court.








The
DTPA prohibits A[f]alse, misleading, or deceptive
acts or practices in the conduct of any trade or commerce.@  Id. '' 17.46(a), (b)(5), (7), (13),
(22), (24), 17.50(a)(1); Everett v. TK-Taito, L.L.C., 178 S.W.3d 844,
857 (Tex. App.CFort Worth 2005, no pet.).  To recover under the DTPA, the plaintiff
must show that (1) he or she is a consumer, (2) the defendant engaged in a
false, misleading, or deceptive act, and (3) the act constituted a producing
cause of economic damages or damages for mental anguish.  See Tex.
Bus. & Com. Code Ann. ' 17.50(a)(1); Doe v. Boys Clubs
of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex. 1995). 

Section
17.46(b) sets forth a list of ways in which one can engage in false or
misleading practices.  Here, the trial
court found that appellants violated the following subsections of section
17.46(b):

(5)  representing that goods or services have
sponsorship, approval, characteristics, ingredients, uses, benefits, or
quantities which they do not have or that a person has a sponsorship, approval,
status, affiliation, or connection which he does not;

 

.
. . .

 

(7)  representing that goods or services are of a
particular standard, quality, or grade, or that goods are of a particular style
or model, if they are of another; 

 

.
. . .

 

(12)  representing that an agreement confers or
involves rights, remedies, or obligations which it does not have or involve, or
which are prohibited by law;

 

.
. . .

 

(13)
knowingly making false or misleading statements of fact concerning the need for
parts, replacement, or repair service;

 

.
. . .

 

(20)
representing that a guarantee or warranty confers or involves rights or
remedies which it does not have or involve . . .; [and]

 

.
. . .








 

(24)  failing to disclose information concerning
goods or services which was known at the time of the transaction if such
failure to disclose such information was intended to induce the consumer into a
transaction into which the consumer would not have entered had the information
been disclosed.

 

Tex. Bus.
& Com. Code Ann. '' 17.46(b)(5), (7), (12), (13), (20), (24).

 

Appellants
contend that the evidence is insufficient to support a violation of subsections
5, 7, 12, and 20 because Smith=s statements to the HonakersCthat Athat shouldn=t be a problem [the house falling off the
hill] . . . [t]his house and lot [are] as solid as they
come,@ that the Honakers Awould not have any problems with the house or the property
falling away,@ and that he Abuilt solid homes on solid lots@Cwere merely statements of opinion
and not misrepresentations of fact. 
They further contend that the evidence is insufficient to support a
violation of subsections 13 and 24 because those subsections require that the
misrepresentation be intentional and knowing, and the evidence shows that
appellants Ahad no intent to misrepresent the
stability of the lot or home nor [had] any knowledge that any alleged
misrepresentation concerning same was untrue.@ 








With
respect to subsections 5, 7, 12, and 20, appellants contend that Smith=s statements to the Honakers were merely opinion rather
than misrepresentations of fact because Richard testified that he did not think
that Smith knew whether his promises about the land were true or false and that
A[h]e was just giving me an opinion
that he thought it would be okay.@ 
They also claim that the Honakers failed to prove that they relied on
any false, misleading, or deceptive act or practice to their detriment because
the evidence shows that (1) Smith is not an engineer, (2) he provided the
Honakers with two engineering reports and agreed to a seven-day free-look
period under the contract so that the Honakers could obtain satisfactory
engineering reports, (3) the Adefect@ was not known to anyone until more than seven months
after the slope failure and one and one half years after the Honakers purchased
the home and nothing in the evidence indicates appellants should have known of
the defect before then. 








Misrepresentations
are actionable under the DTPA Aso long as they are of a material
fact and not merely >puffing= or opinion.@ 
Pennington v. Singleton, 606 S.W.2d 682, 687 (Tex. 1980); Kessler,
953 S.W.2d at 519.  In Kessler v.
Fanning, this court held that three factors must be considered in
determining whether a statement is an opinion or actionable
misrepresentation:  the specificity
versus the vagueness of the statement, the comparative knowledge of the buyer
and seller, and whether the representation relates to a past or current event
or condition versus a future event or condition.  953 S.W.2d at 520.  In
that case, statements of the seller in the property condition disclosure form
that there was not any Aimproper drainage@ and no Aprevious structural repair@ were not mere opinions and therefore actionable under the
DTPA.  Id.

Here,
Smith=s statements affirmatively assert
that the property and home are stable and able to support the home and fill dirt,
which they were not.  These statements
are specific, and Smith, as the representative of the home builder, was in a
better position to know about the condition of the property than the Honakers,
both of whom are physicians.  Although
this was Smith=s first million-dollar home, and
although he testified that he relied solely on his engineers to interpret the
reports given to him by the developer, Smith had been building homes for
several years; thus, regardless of the extent of his knowledge, it was
comparably greater than the Honakers=. 
Furthermore, Smith=s statements about the condition
of the home and property apply equally to the present and future condition of
the home and property.  Regardless of
Richard=s characterization of Smith=s statements, when reviewing them in light of relevant
case law, it is clear that they are more than mere opinion.  Moreover, we have previously discussed the
evidence supporting the Honakers= reliance on Smith=s statements in purchasing the property. 








Because
the evidence is sufficient to support the trial court=s finding and conclusion that appellants violated at least
one of the laundry list prohibitions in section 17.46(b), we need not address
appellants= contentions as to the remaining
violations.  See Tex. R. App. P. 47.1; Checker Bag
Co. v. Washington, 27 S.W.3d 625, 634 (Tex. App.CWaco 2000, pet. denied). 
We overrule appellants= fourth issue.

Moreover,
having determined that the trial court=s judgment can be sustained based
on the Honakers= DTPA claims, we overrule
appellants= first issue.

 

 

 

Knowing
violation of DTPA

In
their fifth issue, appellants contend that the evidence is legally and
factually insufficient to support a finding that appellants= knowingly committed one of the Alaundry list@ violations.








A
finding that the defendant acted knowingly is a prerequisite to an award for
mental anguish[16] under
the DTPA.  Tex. Bus. & Com. Code Ann. ' 17.50(b)(1); Valley Nissan,
Inc. v. Davila, 133 S.W.3d 702, 715 (Tex. App.CCorpus Christi 2003, no pet.).[17]  To prove that misrepresentations were made Aknowingly,@ for DTPA purposes, a party must
show that the misrepresentations were made with

actual awareness, at the time of
the act or practice complained of, of the falsity, deception, or unfairness of
the act or practice giving rise to the consumer=s claim or, in an action brought
under Subdivision (2) of Subsection (a) of Section 17.50 [breach of express or
implied warranty], actual awareness of the act, practice, condition, defect, or
failure constituting the breach of warranty, but actual awareness may be
inferred where objective manifestations indicate that a person acted with
actual awareness.

 

Tex. Bus. & Com. Code Ann. ' 17.45(9) (Vernon 2002).  The supreme court has explained  Aactual awareness@ as follows:

AActual awareness@ does not mean merely that a
person knows what he is doing; rather, it means that a person knows that what
he is doing is false, deceptive, or unfair. 
In other words, a person must think to himself at some point, AYes, I know this is false, deceptive, or unfair to him,
but I=m going to do it anyway.@  

 








St. Paul
Surplus Lines Ins. Co. v. Dal‑Worth Tank Co., 974 S.W.2d 51, 53‑54 (Tex.
1998).  Direct evidence is not required
to show that a misrepresentation was made Aknowingly.@  Gomez v. Diaz,
57 S.W.3d 573, 579 (Tex. App.CCorpus Christi 2001, no
pet.).  

Both
Richard and Ginger testified at trial that they did not believe Smith made any
statements to them that he did not believe to be true when he made them.  Richard testified, AI think he believed the land would be okay@ and that Smith Ahad no knowledge whether [his]
statements were false or true.@  
Although Richard later agreed that he thought Smith knowingly
misrepresented the investigation he had done regarding the stability of the lot
and slope, he never testified to any specific misrepresentations regarding the
extent of the investigation into the stability of the lot. 








Smith
testified that the first time he saw the lot, it had already been filled, and
the retaining walls were already in place. 
He never inspected the fill dirt personally, but he relied on the two
reports (the Rone report and additional borings report) that he obtained from
the developer.  Smith said that he did
not think he needed to do any further investigation because Parrent told him he
didn=t need to do any additional
investigation.  Smith said that he and
Parrent relied entirely on the two reports from the developer.  Smith did not verify that any of the
recommendations in the Rone report had been done; he did not understand the
report and just gave it to Parrent, his engineer. 








The
Honakers contend that appellants= receipt of the Rone report and
additional borings report confers knowledge of the property condition on
appellants; in effect, their argument is that by virtue of appellants= receipt of those reports, they should have known that the
statements to the Honakers were false or misleading.[18]  But although Whitney Smith, the engineer who
testified for the Honakers, testified that the Rone report raised concerns
about the stability of the property, he specifically agreed that the report
would Araise a red flag@ for A[m]ost engineers familiar
with the formations@ upon which the property was
built.  [Emphasis added.]  There is no evidence that anyone other than
an engineer would have been alerted to the stability problems simply by reading
both reports.  We conclude that there is
no evidence to support the trial court=s finding that appellants= Aknowingly@ violated the DTPA. 
Thus, we sustain appellants= fifth issue as to the second half
of finding of fact 5.3 and as to conclusion of law 19.5.[19]   

Propriety
of Turnover Order

In
their sixth issue, appellants contend that the trial court abused its
discretion by ordering that appellants turn over A[t]he insurance policy,
declarations, and all documents related [to] Great American Lloyds policy
PAC-982-01-64-01@ and A[a]ll insurance claims or causes of action of [appellants]
pursuant to [that] policy.A 
Appellants contend that the trial court was not authorized to order such
a turnover in the absence of a motion by the Honakers, that there is no
evidence to support the turnover order, and that the turnover orders are
premature.








Section
31.002 of the civil practice and remedies code provides a method for
court-ordered collection of judgments, authorizing the trial court, among other
things, to order the debtor to turn over nonexempt property that cannot readily
be attached or levied on by ordinary legal process.  Tex. Civ. Prac. & Rem.
Code Ann. ' 31.002(a), (f) (Vernon Supp.
2005).  We review a turnover order for
an abuse of discretion.  Beaumont
Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex. 1991); Roosth v. Roosth,
889 S.W.2d 445, 458 (Tex. App.CHouston [14th Dist.] 1994, writ
denied).  In the context of turnover
orders, a trial court=s decision will not be overturned,
even when it is based on an erroneous conclusion of law, if the judgment is
sustainable for any reason.  Buller,
806 S.W.2d at 226.  Whether there is
sufficient evidence to support the turnover order is a relevant consideration
in determining whether the trial court abused its discretion.  Id.

Appellants
claim that the Honakers had the burden to prove that the insurance policy and
potential bad faith claims were subject to the turnover statute.  The turnover statute applies to property
within the judgment debtor=s possession or subject to his
control.  Tex. Civ. Prac. & Rem. Code Ann. ' 31.002(b)(1); Ross v. Nat=l Ctr. For Employment of the Disabled, 170 S.W.3d 635, 638 (Tex. App.CEl Paso 2005, pet. filed).  Once assets are traced to the judgment debtor, a presumption
arises that those assets are in his possession, and the burden then shifts to
him to account for the assets.  Buller,
806 S.W.2d at 226; Ross, 170 S.W.3d at 638-39.








The
Honakers contend that appellants= due process argumentsCthat they were deprived of notice and a hearing on this
matterCfail because the insurance policy
and potential bad faith claims are not corporeal assets, but choses in action,
and thus, they are intangible.  See
Day v. Day, 896 S.W.2d 373, 376 (Tex. App.CAmarillo 1995, no writ).  But a cause of action is property to which
the turnover statute applies.  Charles
v. Tamez, 878 S.W.2d 201, 205 (Tex. App.CCorpus Christi 1994, writ denied);
Criswell v. Ginsberg & Foreman, 843 S.W.2d 304, 306 (Tex. App.CDallas 1992, no writ). 


In
addition, the Honakers, citing Universe Life Ins. Co. v. Giles, 982
S.W.2d 488, 492-93 (Tex. App.CTexarkana 1998, pet. denied),
argue that even if the trial court abused its discretion in ordering the
turnover, the error is not reversible because appellants= insurance company has not posted a superseades bond, has
not alleged that it was harmed, and the trial court=s order involves a benefit to appellants (because the
potential bad faith claims would actually be brought for appellants= benefit). 
However, we have found no authority requiring a third party who is not
alleged to be in possession of property to post a supersedeas bond to prevent
the turnover of that property.








Section
31.002(d) provides that A[t]he judgment creditor may
move for the court=s assistance under this section in the same proceeding in which the
judgment is rendered or in an independent proceeding.@  Tex. Civ. Prac. & Rem. Code Ann. ' 31.002(d) (emphasis added).  The purpose of the turnover statute is to aid a diligent judgment
creditor to reach certain types of property of a judgment debtor.  Criswell, 843 S.W.2d at 306.  There is nothing in the record indicating
that the Honakers ever requested that the trial court aid them in collecting
the judgment by ordering appellants to turn over this property.

The
turnover statute is purely procedural; its purpose is to ascertain whether an
asset is either in the judgment debtor=s possession or subject to its
control.  Republic Ins. Co. v. Millard,
825 S.W.2d 780, 783 (Tex. App.CHouston [14th Dist.] 1992, orig.
proceeding).  The statute itself does
not require notice and a hearing.  See
Tex. Civ. Prac. & Rem. Code Ann.
' 31.002; Sivley v. Sivley,
972 S.W.2d 850, 861 (Tex. App.CTyler 1998, no pet.).  However, a factual showing that the judgment
debtor has nonexempt property that is not readily subject to ordinary execution
is of particular importance in applying section 31.002.  Clayton v. Wisener, 169 S.W.3d 682,
684 (Tex. App.CTyler 2005, no pet.); see
Schultz v. Fifth Judicial Dist. Court of Appeals at Dallas, 810 S.W.2d 738,
740 (Tex. 1991) (orig. proceeding), abrogated on other grounds by In re
Sheshtawy, 154 S.W.3d 114 (Tex. 2004). 
Section 31.002 authorizes a turnover order only upon proof of the
necessary facts.  See Schultz,
810 S.W.2d at 740; Clayton, 169 S.W.3d at 684. 








Here,
there is no evidence in the record of any of the necessary facts.  Appellants do not contend on appeal that
they do not own the property, that it is not readily subject to execution, or
that it is exempt.  But they do not
admit it either, and they do specifically challenge the sufficiency of the
evidence to support these findings.  We
conclude that the trial court abused its discretion by ordering appellants to
turn over A[t]he insurance policy,
declarations, and all documents related [to] Great American Lloyds policy
PAC-982-01-64-01@ and A[a]ll insurance claims or causes of action of [appellants]
pursuant to [that] policy.A 
Therefore, we sustain appellant=s sixth issue.

Prejudgment
Interest

In
their seventh issue, appellants contend that the trial court erred by awarding
prejudgment interest on damages representing future repair costs to the
home.  The trial court=s judgment provides, in pertinent part, as follows:  ATHE COURT HEREBY ORDERS that [the Honakers] recover from
[appellants] past and future cost of repairs in the sum of $221,585.06 [and
other listed damages] . . . . The court further orders
prejudgment interest at the annual rate of 5.0% on that
sum . . . .@ 
[Emphasis added.]  In its
findings of fact, the trial court segregated these damages and found that the
Honakers were entitled to past repair costs of $152,302.06 and future repair
costs of $69,283. 








Prejudgment
interest is not recoverable on an award of future damages.  Tex.
Fin. Code Ann. ' 304.1045 (Vernon Supp.
2005).  The Honakers concede that the
trial court erred in awarding prejudgment interest with respect to future costs
of repair.  However, the parties dispute
appellants= remedy for this error.  The Honakers contend that we may modify the
judgment to exclude the award of prejudgment interest as to the future costs of
repair.  See Tex. R. App. P. 43.2(b).  Appellants contend we must reverse the
entire award of prejudgment interest and render a take-nothing judgment on the
Honakers= request for prejudgment  interest because the Honakers did not
segregate their past and future damages. 
See Cresthaven Nursing Residence v. Freeman, 134 S.W.3d 214, 223
(Tex. App.CAmarillo 2003, no pet.).  Appellants do not challenge the amount of
future costs of repair awarded to the Honakers.

In
CresthavenCwhich cites Cavnar v. Quality
Control Parking, Inc., 696 S.W.2d 549 (Tex. 1985), abrogated in part on
other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,
962 S.W.2d 507 (Tex. 1998)Cthe plaintiff failed to segregate
past and future damages in its jury charge. 
Id. at 222-23.  The same
situation occurred in Cavnar. 
696 S.W.2d at 556.  But the
instant case was a bench trial, and the trial court=s findings show that the Honakers did segregate their past
and future costs of repair.  Thus,
penalizing the Honakers by deleting the entire award of prejudgment interest
would not comport with the reasoning of Cavnar or Cresthaven.  We hold that the correct disposition in this
case is to modify the judgment to exclude $69,283Cthe amount the trial court found
to be attributable to future costs of repairCfrom those damages upon which
prejudgment interest is awarded.  We
sustain appellants= seventh issue.








Mental
Anguish Damages

Appellants
complain about the general award of $50,000 in mental anguish damages to the
Honakers; appellants contend that the trial court should have stated how much
of the $50,000 was payable to Ginger and how much was payable to Richard.  As the Honakers note in their brief,
appellants do not contend that the award of mental anguish damages is improper,
but they do contend that the trial court failed to delineate how the $50,000
should be divided between the Honakers.

Appellants
cite Wingate v. Hajdik, 795 S.W.2d 717 (Tex. 1990), for the proposition
that a trial court errs when it renders a judgment for one plaintiff that
includes damages that only another party is entitled to recover.  But in Wingate, the trial court=s judgment for the plaintiff included damages for a cause
of action available only to the corporation of which the plaintiff was a
stockholder.  Id. at 719.  Here, the Honakers, a married couple, joined
in their pleadings and brought the same causes of action against appellants on
which they were both entitled to recover. 








Appellants
contend that the damages should have been segregated because they are the
separate property of each spouse.  See
Tex. Fam. Code Ann. ' 3.001(3) (Vernon 1998); Pratho v. Zapata, 157
S.W.3d 832, 852 (Tex. App.CFort Worth 2005, no pet.) (Walker,
J., concurring).  But appellants fail to
articulate why this characterization of the property affects them rather than
the Honakers.  The Honakers, who appear
to be the ones affected by the characterization of their marital property, have
not challenged the lack of segregation of the mental anguish damages award in
the judgment.  

Each
of the Honakers testified that they experienced physical symptoms as a result
of their mental anguish over the problems with the property.  Ginger testified that she suffered migraine
headaches and that her relationship with Richard had suffered.  Richard testified that he was severely
depressed and had to take medication, that he and Ginger fought more often and
weren=t able to relax and enjoy their
home as the haven they had hoped it would be. 
He also testified that he experienced sleeplessness, flattened affect,
and changes in his appetite.  This
evidence is sufficient to support the Honakers= claim for mental anguish
damages.  See Parkway Co. v. Woodruff,
901 S.W.2d 434, 443 (Tex. 1995).  

Neither
of the Honakers complains that the damages were not segregated between
them.  Appellants have not demonstrated
how theyCrather than the HonakersCwere harmed by the trial court=s failure to segregate those damages.  See Tex.
R. App. P. 44.1(a).  We overrule
appellants= eighth issue.

Out-of-Pocket
Expenses and Court Costs








In
their ninth and tenth issues, appellants contend that the evidence is legally
and factually insufficient to support the trial court=s award to the Honakers of out-of-pocket expenses in the
amount of $5,229.23 and court costs of $3,736.65.  The Honakers concede that the award of out-of-pocket expenses is
not supported by evidence and should be deleted.  Thus, we sustain appellants= ninth issue.  The Honakers also concede that the evidence
supports an award of court costs in the amount of $2,676.65 rather than
$3,736.65. Appellants contend that the Honakers are not entitled to court costs
because those costs were subsumed within the attorney=s fees award, but they also agree that if the Honakers are
entitled to recover their costs, then those costs should be modified to reflect
an award of $2,676.65.  See Wright v.
Pino, 163 S.W.3d 259, 262 (Tex. App.CFort Worth 2005, no pet.).








Appellants
contend that the award of court costs to the Honakers violates the Aone satisfaction rule,@ which provides that a plaintiff
may recover only for the damages suffered as a result of a particular
injury.  Utts v. Short, 81 S.W.3d
822, 833 (Tex. 2002); Foley v. Parlier, 68 S.W.3d 870, 882 (Tex. App.CFort Worth 2002, no pet.).  A party may not obtain a double recovery for the same
injury.  Waite Hill Servs., Inc. v.
World Class Metal Works, Inc., 959 S.W.2d 182, 184 (Tex. 1998).  Appellants claim that the court costs were
included within the $176,692.40 testified to by McQuality and, thus, were also
presumptively included in any recovery based on the contingency fee agreement.

A
review of the first page of Exhibit 25, the attorney=s fees and expenses summary, shows that the $176,692.40 is
the total amount for attorney=s fees only.  Expenses were not included within that
amount.  In addition, the invoices
included in Exhibit 25 show that according to the hybrid contingency fee
agreement, the Honakers paid all costs and expenses outright.  McQuality testified that only $41,000 of
what the Honakers had already paid would be deducted from any attorney=s fees recovery under the contingency fee agreement.  A review of Exhibit 25 shows that this
amount represents only the initial retainer paymentsC$5,000 up front and $2,000 per month thereafterCrepresenting an advance on attorney=s fees.  McQuality
did not testify that the Honakers would receive any deduction for the costs and
expenses they paid.  Thus, we conclude
that the award of court costs to the Honakers does not result in a double
recovery and does not violate the one satisfaction rule.  We sustain appellants= tenth issue to the extent it contends the amount of court
costs awarded was excessive.








Conclusion

Having sustained appellants= sixth, seventh, ninth, and tenth
issues[20]
we modify the judgment to (1) delete the provisions requiring appellants to
turn over A[t]he insurance policy,
declarations, and all documents related [to] Great American Lloyds policy
PAC-982-01-64-01@ and A[a]ll insurance claims or causes of action of [appellants]
pursuant to [that] policy,A (2) delete the award of
out-of-pocket costs, (3) delete the award of court costs of $3,736.65 and award
costs to the Honakers in the amount of $2,676.76, and (4) to delete the award
of prejudgment interest on $69,283, which represents future costs of repair.[21]  Having overruled the remainder of appellants= issues, we affirm the judgment as modified. 

 








TERRIE
LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON,
GARDNER, and WALKER, JJ.

 

DELIVERED: March 23, 2006











[1]In appellants= list of issues presented, they bring two additional
issues, which they did not brief.  It
appears that these issues are contingent upon our disposition of their other
issues.  But because appellants= eleventh and twelfth issues are not briefed, they are
waived.  See Shelton v. Sargent,
144 S.W.3d 113, 119 (Tex. App.CFort Worth 2004, pets. denied).





[2]Smith referred to the home as a Aspec@ home.





[3]The home is located on the middle
of the lot, and the back of the home faces south.  There is a swimming pool behind the home, and the embankment is
located south of the pool, on the southern most part of the property.





[4]The letters were from Parrent
Concrete, Inc., whom Main Place had hired to design the home=s foundation, and Falkofske Engineering, Inc., whom Main
Place hired to examine the main retaining wall along the south side of the
property. 





[5]Appellants also contend that Smith
cannot determine his responsibility under the amended final judgment for
attorney=s fees because the trial court
concluded that the Honakers were entitled to attorney=s fees under both the DTPA and section 38.001 (for the
breach of contract).  Because we must
first determine whether the award of attorney=s fees is supportable under any
theory, we will discuss this contention in our disposition of appellants= third issue.





[6]Appellants do not contend that
they have been unable to adequately present their challenges to the judgment on
the Honakers= DTPA claims.





[7]On page 17 of their brief,
appellants attack only the factual sufficiency of the evidence, but on page 22,
they attack both the legal and factual sufficiency of the evidence.  Thus, we will review the evidence under both
standards.





[8]This occurred after the major
slope failure.  Richard testified that
the property continued to show signs of soil-movement-related damage up until
the time of trial.





[9]Richard obtained these reports
after purchasing the property and after the problems with soil movement began.





[10]In this opinion, all references to
slope grades are horizontal to vertical. 
A Agreater@ slope, meaning a steeper slope, would actually be 2 to 1,
rather than 4 to 1 or higher.  The slope
on the Honakers= property was a 2 to 1 slope.





[11]Specifically, the contract
provided as follows:  ASeller makes no warranties or representations as to the
nature of the soil or composition of the subsurface of the Lot and Purchaser
acknowledges that the Lot may contain fill dirt or any other substance such
that it may not be suitable for the purposes for which Purchaser is acquiring
the Lot.@ 





[12]It does not appear from the record
that Parrent was ever made a party to the suit, either by appellants or the
Honakers.





[13]Richard later equivocated somewhat
and said that he didn=t know what he would have done if
Smith had refused to obtain any engineering reports. 





[14]Contrary to appellants= assertion, this amount represents fees only and excludes
costs and expenses. 





[15]The documents in Exhibit 25 show
that the initial retainer was $5,000, and the subsequent monthly retainers were
$2,000 per month thereafter.  They also
show that the Honakers were responsible for paying all costs and expenses as
they were incurred.





[16]The trier of fact may also award
up to three times the amount of economic damages if it finds a violation was
committed knowingly.  Tex. Bus. & Com. Code Ann. ' 17.50(b)(1).  The
trial court=s findings and conclusions show
that it did not award any additional damages other than mental anguish damages.





[17]The only relief appellants request
in connection with this issue is that this court render judgment in their favor
or set aside the trial court=s findings that appellants acted
knowingly and remand for a new trial. 
They do not ask this court to reverse the trial court=s award of mental anguish damages in connection with their
issue.  A finding that a party Aknowingly@ violated the DTPA is immaterial
if no damages were awarded as a result of that finding.  Checker Bag Co., 27 S.W.3d at
637.  Presumably, the same logic would
apply if the party does not challenge the damages awarded as a result of the Aknowing@ finding (i.e., here, the award of
mental anguish damages).  However, out
of an abundance of caution, we will address appellants= issue.





[18]The Honakers claim that the trial
court Acould well have concluded that the
failure of [appellants] to assert claims against their architect and engineer,
claims only they could have brought, would have brought evidence to the fore
which would have confirmed this fact.@ 
But this supposition is mere speculation and not a reasonable inference
from the facts sufficient to support a finding that appellants= conduct was knowing.





[19]In finding of fact 5.3, the trial
court found that A[a] reasonably prudent builder
knows or should know that the unique geology of the Lot would make it highly
unstable and that construction on the Lot would require a high degree of care
to prevent soil movement and slope failure.@ 
In conclusion of law 19.5, the trial court concluded that appellants Aknowingly misrepresented and failed to disclose certain
conditions of the Home.@ 





[20]Although we sustained appellants= fifth issue as to the second half of finding of fact 5.3
and conclusion of law 19.5, this finding and conclusion are not incorporated
into the judgment.  In addition,
appellants did not challenge the trial court=s mental anguish award on the
ground that there was no evidence to support the trial court=s knowing finding and conclusion.  Thus, we need not modify the judgment in any
way as a result of sustaining appellants= fifth issue.  See Pat Baker Co. v. Wilson, 971 S.W.2d 447, 450 (Tex. 1998)
(holding that trial court cannot reverse judgment based on unassigned error). 





[21]Thus, prejudgment interest shall
be calculated on $152,302.06 (past cost of repairs), $300,000 (permanent
reduction in market value), $12,533.05 (special damages), and $50,000 (mental
anguish damages), less the $30,000 settlement credits.